STATE of Wisconsin, Plaintiff-Respondent,

v.

Daniel H. HANSON,
Defendant-Appellant-Petitioner.

Supreme Court

*No. 2008AP2759–CR. Oral Argument September 6, 2011.
—Decided February 1, 2012.*

2012 WI 4

(Also reported in 808 N.W.2d 390.)

For the defendant-appellant-petitioner, there were briefs by *Chad Lanning* and *Lanning Law Offices, LLC,*

247

West Bend, and *Robert R. Henak* and *Henak Law Office, S.C.,* Milwaukee and oral argument by *Robert R. Henak.*

For the plaintiff-respondent, the cause was argued by *Rebecca Rapp St. John,* assistant attorney general, with whom on the brief was *J.B. Van Hollen,* attorney general.

¶ 1. PATIENCE DRAKE ROGGENSACK, J. This is a review of a published decision of the court of appeals[1] that affirmed the judgment of the circuit court,[2] holding Daniel H. Hanson guilty of fleeing a traffic officer, a felony under Wis. Stat. § 346.04(3) (2007–08).[3] The jury found that Hanson knowingly fled a sheriff's deputy after a traffic stop, and that Hanson's "willful or wanton disregard" of the officer's signal interfered with or endangered the officer or the public. The jury rejected Hanson's self-defense claim by which he asserted that his flight toward a police station was motivated by his fear that the traffic officer would "beat" or "kill" him. Further, Hanson argues that the circuit court should have admitted evidence of the traffic officer's character on the theory that the officer was a "victim" for purposes of admitting character evidence under Wis. Stat. § 904.04(1)(b). Finally, Hanson briefly raises a constitutional claim that he was deprived of the right to present a defense, and that a new trial is warranted in the interest of justice.

---

[1] *State v. Hanson,* 2010 WI App 146, 330 Wis. 2d 140, 792 N.W.2d 203.

[2] The Honorable Wilbur W. Warren, III of Kenosha County presided.

[3] All subsequent references to the Wisconsin Statutes are to the 2007–08 version unless otherwise noted. We employ the 2007–08 version of the statutes because there has been no intervening statutory change that affects this decision.

¶ 2. We conclude that the circuit court properly instructed the jury on the requirements of Wis. Stat. § 346.04(3). Similarly, we hold that there does not exist a subjective, good-faith exception to the fleeing law, and that Hanson's opportunity to demonstrate any justification for his behavior was through his self-defense claim, which the jury considered and rejected. Additionally, we conclude that the circuit court was correct to exclude testimony about the traffic officer's alleged confrontational character because the officer was not a "victim" under Wis. Stat. § 904.04(1)(b). Finally, we conclude that neither the Constitution nor the interest of justice warrants a new trial, as no constitutional infirmities have been raised and the real controversy has, indeed, been tried. Accordingly, we affirm the court of appeals.

## I. BACKGROUND

¶ 3. On the morning of June 29, 2006, Kenosha County Sheriff's Deputy Eric Klinkhammer was monitoring traffic on Interstate 94 when his speed gun registered Hanson's vehicle as traveling 83 miles per hour in a 65 mile-per-hour zone.[4] Klinkhammer caught up with Hanson, pulled along the right side of Hanson's vehicle (which was in the far left lane), and motioned for Hanson to pull over to the right side of the inter-

---

[4] The morning of the incident in question, Klinkhammer had a "ride-along," Ms. Randi Derby, who was then an intern with the Kenosha County Sheriff's Department. Derby was interested in pursuing a career in law enforcement and subsequently took a position as a dispatcher with the Brown Deer Police Department. Ms. Derby's account of the events largely corresponds with Klinkhammer's. As stated in the record, the two had not spoken since the day of Ms. Derby's eventful ride-along.

state. Klinkhammer then activated his emergency lights and came to a stop behind Hanson.

¶ 4.   Soon after the vehicles stopped, but before Klinkhammer was able to get out of his squad car, Hanson exited his vehicle and came toward the squad car with his license in hand, gesticulating, and yelling at the deputy. Using the squad car's PA system, Klinkhammer told Hanson multiple times to return to his vehicle. When Hanson refused, the deputy got out of his vehicle and demanded that Hanson return to his car. Hanson continued to shout at Klinkhammer, pacing back and forth, waving his arms, and generally acting "bizarre[ly]," as Klinkhammer later testified. Hanson continued to refuse to return to his vehicle until Klinkhammer extended his baton, which he displayed beside his leg, and ordered Hanson back to his vehicle.

¶ 5.   After Hanson finally re-entered his vehicle, Klinkhammer called for backup and walked over to the passenger-side window of Hanson's vehicle to avoid traffic passing on the driver's side. The deputy asked Hanson to roll down the passenger-side window and provide his license. Klinkhammer said that Hanson refused to immediately comply; instead he yelled about the violation of rights that he said Klinkhammer was perpetrating. Hanson said that when he rolled down the window Klinkhammer took his license "very gruffly." Randi Derby, who was a "ride-along" intern with Klinkhammer, said that Hanson "flicked" his license out the window and it fell to the ground.

¶ 6.   At that point, the deputy informed Hanson that he would be cited for speeding. Klinkhammer began walking back to his squad car, but before the deputy could finish writing the ticket, Hanson had again alighted from his vehicle. Once more, Hanson shouted at the deputy, pacing next to the interstate,

250

and, according to both Klinkhammer and Ms. Derby, behaving in a disturbing manner. Hanson said that he got out of his car a second time to explain that he had not been speeding. Hanson said Klinkhammer "screamed" at him to "Get back in the car." Klinkhammer said that he again extended his baton, which he displayed next to his leg, and ordered Hanson back to his vehicle. Recognizing the tension in the situation to be rising, the deputy once more radioed for backup.

¶ 7. Klinkhammer then told Hanson that he was under arrest. At that point, Hanson abruptly abandoned his tirade and ran to his car. As Hanson entered his vehicle, Klinkhammer reached for Hanson and ripped Hanson's shirt as he squirmed away from the deputy. Hanson locked his car door and pulled out into traffic, with Klinkhammer standing approximately two feet from the vehicle.

¶ 8. After escaping to his car, Hanson immediately telephoned 911 and demanded directions to the nearest police station because, as he said, Klinkhammer was "endangering my life." As Hanson drove down the interstate, he was in constant communication with the 911 dispatcher who initially directed Hanson to pull over, after which he informed Hanson that other officers were on the way, and that their presence would mitigate any perceived threat from Klinkhammer. After Hanson refused multiple requests by the dispatcher to pull over and continued to demand directions to the nearest police station, the dispatcher began guiding Hanson to the Pleasant Prairie police station.

¶ 9. During the course of Hanson's flight, Kenosha County Sheriff's Deputy Samuel Sturino joined Klinkhammer in pursuit of Hanson. As Hanson exited Interstate 94, Sturino positioned his fully marked squad car with lights and sirens on where

Hanson clearly could see him, but not in such a way as to totally block Hanson's travel. Hanson ignored Sturino's directions and did not stop. After Hanson briefly swerved toward Sturino and nearly struck the squad car, the deputy quickly pulled his vehicle ahead of Hanson's to cut him off. Hanson was forced to a stop at the next red light.

¶ 10. After Hanson was stopped at the light, the deputies exited their vehicles, approached the driver's side of Hanson's vehicle, and ordered Hanson to exit the car; Hanson refused. Klinkhammer demanded multiple times that Hanson open the door and exit the vehicle. He warned that if Hanson did not comply, Klinkhammer would break the window to open the door. When Hanson refused to open his door, Klinkhammer broke the window, opened the door, and he and Sturino "directed [Hanson] to the ground."

¶ 11. Hanson was initially charged with a misdemeanor under Wis. Stat. § 346.04(2t), for failure to stop his vehicle after receiving a signal from a marked police vehicle. Well before trial, however, prosecutors dismissed the misdemeanor charge and charged Hanson under the felony fleeing and eluding statute, § 346.04(3).[5] Hanson claimed he fled because he feared for his life due to Klinkhammer's aggressive conduct. In response to a motion in limine by Hanson, the circuit court held that testimony about Klinkhammer's alleged confrontational character would not be admitted. Hanson had argued that such testimony was admissible on the theory that Klinkhammer was a "victim" of

---

[5] Hanson also was charged with two counts of violating Wis. Stat. § 946.41(1), obstructing an officer. Other than the general challenges to his conviction on grounds of evidentiary infirmities and on his interest of justice claim, Hanson does not challenge those convictions here.

Hanson's flight for purposes of the character evidence rule, Wis. Stat. § 904.04. A jury found that Hanson's actions constituted felony fleeing under § 346.04(3), notwithstanding Hanson's self-defense claim, and judgment was entered on the jury's guilty verdict.

¶ 12.   On appeal, Hanson challenged the verdict on the ground that the evidence was insufficient to show that he knowingly fled, or that he did so with "willful or wanton disregard" of the officers' directions or the public's safety. Additionally, Hanson has argued that the circuit court erred as a matter of law when it excluded evidence of Klinkhammer's character. The court of appeals affirmed Hanson's conviction. Hanson petitions us to overturn the jury's verdict based on insufficiency of the evidence to prove a violation of Wis. Stat. § 346.04(3) as he interprets § 346.04(3) and based on his interpretation of Wis. Stat. § 904.04(1)(b). Hanson asserts that the circuit court's evidentiary ruling excluding evidence of Klinkhammer's aggressive character precluded Hanson from fully presenting his theory of self-defense. He contends that this is a constitutional basis for reversal, as well as the basis for a new trial in the interest of justice.

¶ 13.   We granted review and now affirm the court of appeals.

## II.   DISCUSSION

### A.   Standard of Review

■

¶ 14.   Hanson frames part of his appeal as a challenge to the sufficiency of the evidence. However, as a foundational matter, he actually is asking us to interpret and apply Wis. Stat. § 346.04(3). Questions of

statutory interpretation and application are questions of law that we review independently. *See State v. Jensen*, 2010 WI 38, ¶ 8, 324 Wis. 2d 586, 782 N.W.2d 415. Here, we are asked to interpret and apply § 346.04(3) and Wis. Stat. § 904.04(1)(b).

¶ 15.  We also independently review whether the evidence was sufficient to sustain a jury verdict, but in so doing, we view the evidence most favorably to sustaining the conviction. *Tammy W-G. v. Jacob T.*, 2011 WI 30, ¶ 17, 333 Wis. 2d 273, 797 N.W.2d 854; *State v. Poellinger*, 153 Wis. 2d 493, 501, 451 N.W.2d 752 (1990). Finally, we independently review Hanson's constitutional claim as a question of law, *Randy A.J. v. Norma I.J.*, 2004 WI 41, ¶ 12, 270 Wis. 2d 384, 677 N.W.2d 630, and his interest of justice claim in accordance with this court's discretion under Wis. Stat. § 751.06.

B.   General Principles of Statutory Interpretation

¶ 16.  When we engage in statutory interpretation, we focus on the words that the legislature chose for the statute. Our task in "statutory interpretation is to determine what the statute means so that it may be given its full, proper, and intended effect." *State ex rel. Kalal v. Circuit Court for Dane Cnty.*, 2004 WI 58, ¶ 44, 271 Wis. 2d 633, 681 N.W.2d 110. Statutory language is given its "common, ordinary, and accepted meaning, except that technical or specially-defined words or phrases are given their technical or special definitional meaning." *Id.*, ¶ 45. Moreover, we examine statutory language with the purpose of giving "reasonable effect to every word, in order to avoid surplusage." *Id.*, ¶ 46.

¶ 17. "Context and [statutory] purpose are important in discerning the plain meaning of a statute." *Jensen,* 324 Wis. 2d 586, ¶ 15. We favor an interpretation that fulfills the statute's purpose. *Id.* "Statutory interpretation involves the ascertainment of meaning, not a search for ambiguity." *Kalal,* 271 Wis. 2d 633, ¶ 47 (quoting *Bruno v. Milwaukee Cnty.,* 2003 WI 28, ¶ 25, 260 Wis. 2d 633, 660 N.W.2d 656).

### 1.   Wisconsin Stat. § 346.04(3)

¶ 18.   Based on various arguments, Hanson asserts that "willful or wanton," as it is employed in Wis. Stat. § 346.04(3), requires an evil or malicious state of mind when disregarding the officer's direction. He asserts his conduct could not satisfy the statutory standard because he fled out of fear that the officer would injure him.

¶ 19.   Our first task then is to interpret the language of Wis. Stat. § 346.04(3). Based on that interpretation, we decide whether the circuit court erred in instructing the jury that willful disregard of an officer's signal was sufficient to support a conviction under the statute and whether the evidence was sufficient to support the jury verdict. Additionally, we must determine whether the legislature's choice of language provided a subjective good faith defense when an individual charged under the statute maintains that he acted without evil intent or ill will.

¶ 20.   Wisconsin Stat. § 346.04(3) provides:

> No operator of a vehicle, after having received a visual or audible signal from a traffic officer, or marked police vehicle, shall knowingly flee or attempt to elude any traffic officer by willful or wanton disregard of such signal so as to interfere with or endanger the operation

255

of the police vehicle, or the traffic officer or other vehicles or pedestrians, nor shall the operator increase the speed of the operator's vehicle or extinguish the lights of the vehicle in an attempt to elude or flee.

¶ 21.   We conclude that the term "willful" as used in Wis. Stat. § 346.04(3) is defined by examining its use within the context of this specific statute. This is so because "willful is susceptible of different meanings in different contexts." *State v. Cissell,* 127 Wis. 2d 205, 210, 378 N.W.2d 691 (1985).

¶ 22.   In Wis. Stat. § 346.04(3), "willful" modifies "disregard." In that context, "willful" requires a subjective understanding by the defendant that a person known by the defendant to be a traffic officer has directed the defendant to take a particular action, and with that understanding, the defendant chose to act in contravention of the officer's direction. Accordingly, the purpose it serves is to require compliance with directions made by known law enforcement personnel. Furthermore, in the nearly 150 years since this court's decision in *State v. Preston,* 34 Wis. 675 (1874), our interpretations of the term "willful" have demonstrated that, contrary to Hanson's suggestion, an act done "willfully" does not require a showing of "personal hate or ill will." *See, e.g., Cissell,* 127 Wis. 2d at 212.

¶ 23.   In *Cissell,* we examined the meaning of "willful" in a criminal context and concluded that our earlier discussion of the term in *Preston,* in which we had equated acts done "willfully" to those done with "malice," was not intended to impose upon "willful" a heightened intent requirement. *See Cissell,* 127 Wis. 2d at 210–12 (examining *Preston,* 34 Wis. at 683–84). We distinguished "malice" in its colloquial sense, which may imply evil intent, personal hate, or ill will, and concluded

that, in a legal sense, "malice" does not require a showing of anything more than criminal intent. *See id.* at 212.

¶ 24.   Hanson asserts that the meaning of "willful or wanton" in Wis. Stat. § 346.04(3) is ambiguous, and that a synthesis of various dictionary definitions provides the proper guidance. However, Hanson's resort to dictionary definitions for the meaning of "willful or wanton" in § 346.04(3) will not disrupt the manner in which we establish the meaning of those terms. Rather, our precedent instructs that we look to the context in which a statutory term is used, *Kalal,* 271 Wis. 2d 633, ¶ 46. Most importantly, if the language of the statute is clear on its face, that plain meaning is applied. *See id.,* ¶ 45.

¶ 25.   Hanson relies heavily on this court's statement in *Preston,* 34 Wis. at 683, that the term "willfully . . . is undoubtedly susceptible of different shades of meaning or degrees of intensity according to the context and evident purpose of the writer." Pointing to *Preston,* Hanson argues that the phrase "willful or wanton" in Wis. Stat. § 346.04(3) is ambiguous, and that the term should be read to require something more than criminal intent, such as *evil* intent. As we explained above, we reject this interpretation of willful, as it neither comports with our interpretations of willful in other contexts since *Preston,* nor does it support the statutory purpose of requiring compliance with directions from known law enforcement personnel.

¶ 26.   Hanson   also   asserts   that   Wis.   Stat. § 346.04(3) includes a good faith exception, as a sort of built-in, subjective self-defense claim. In effect, Hanson claims that, regardless of whether the jury found his actions to be justifiable self-defense, he could not have

257

violated § 346.04(3) because he lacked the requisite scornful state of mind to willfully or wantonly disregard the officer's signals. This argument, similar to Hanson's argument that the trial court erroneously interpreted § 346.04(3), is contrary to the plain meaning of the fleeing statute.

¶ 27. Based on the conduct necessary to show a "willful" disregard, we decline to read Wis. Stat. § 346.04(3) as providing a good faith exception to compliance. The statute requires: a subjective understanding by the defendant that a person known by the defendant to be a traffic officer has directed the defendant to take a particular action, and with that understanding, the defendant chose to act in contravention of the officer's direction. This requirement does not include a showing that the defendant had an evil or scornful state of mind.

¶ 28. After hearing the testimony and viewing the evidence, the jury was given the jury instruction, which states that to satisfy the statutory elements of Wis. Stat. § 346.04(3), the State must have shown that Hanson (1) "operated a motor vehicle on a highway after receiving a visual or audible signal from a marked police vehicle," and (2) that he "knowingly fled or attempted to elude a traffic officer by willful disregard of the visual or audible signal so as to endanger other vehicles."[6] Wis JI—Criminal 2630 (as modified). Further, the jury was given the instruction on self-defense, which requires

---

[6] The jury instructions define "traffic officer" as "every officer authorized by law to direct or regulate traffic or to make arrests for violation of traffic regulations." Wis JI—Criminal 2630.

that an alleged offender show: (1) that he believed that there existed an actual or imminent unlawful interference with his person; (2) that his actions were necessary to prevent or terminate the interference; and (3) that his beliefs were objectively reasonable. *See* Wis JI—Criminal 800 (self-defense instruction); *cf. State v. Coleman,* 206 Wis. 2d 199, 210–11, 556 N.W.2d 701 (1996) (setting out elements of self-defense claim, including core elements of perceived threat, necessity, and objective reasonability).

¶ 29. The jury concluded that Hanson was not acting in self-defense when he fled the scene of the initial stop or when he attempted to elude Sturino's squad car, which was in "complete emergency mode." If we were to interpret Wis. Stat. § 346.04(3) as encompassing a good faith defense, we would, in effect, nullify the jury's findings that Hanson's actions did not qualify as self-defense.[7] The jury was properly instructed on self-defense.

■■

¶ 30. We also conclude that the jury was properly instructed when it was told that a finding of willful disregard would satisfy the statutory requirements.

---

[7] Moreover, it is not clear what effect a good faith defense would have that is not already served by a self-defense claim or by the application of the statutory elements. For example, if the subjective defense is that Hanson intended no harm, the statute's criminal intent requirement controls; that is, neither harm nor the intent to cause harm are elements of fleeing an officer. Alternatively, the argument that Hanson's fear of Klinkhammer precludes any violation of the statutory elements ignores the fundamental purpose of a self-defense instruction: the reasonability of Hanson's fear and his actions were questions properly before the jury, and were answered in the negative.

The Jury Instructions Committee was correct in permitting the omission of the "or wanton" option from the instructions for fleeing an officer, at least in this case. *See* Wis JI—Criminal 2630 cmt. 3 (omitting "wanton" unless deemed necessary in a particular case). Either willful or wanton disregard is sufficient to result in a statutory violation. However, including wanton would have added nothing here because the State's case was not that Hanson acted in any way other than with willful disregard of Klinkhammer's and Sturino's signals when he drove away after being stopped by Klinkhammer and refusing to stop for Sturino.[8] Hanson's asserted good faith cannot overcome the meaning of the statute's language and the jury's finding that Hanson was not proceeding in self-defense.

■■■

¶ 31. We therefore turn to whether the evidence was sufficient to support the jury's verdict. A conviction based on a jury's verdict will be sustained unless "the evidence, viewed most favorably to the state and the conviction, is so insufficient in probative value and force that it can be said as a matter of law that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt." *Poellinger,* 153 Wis. 2d at 501. This high standard translates into a substantial burden for a defendant seeking to have a jury's verdict set aside on

---

[8] The legislature's use of the disjunctive in Wis. Stat. § 346.04(3) provides that either willful or wanton acts demonstrating disregard for a traffic officer's signal will violate the statute—a showing of both elements is not necessary. This case does not require us to interpret the term "wanton," and we therefore conclude that Hanson's argument analogizing "willful or wanton" in § 346.04(3) to the phrase "willful and wanton" in other contexts is inapposite, based on the legislature's clear choice of language.

grounds of insufficient evidence. *See State v. Booker,* 2006 WI 79, ¶ 22, 292 Wis. 2d 43, 717 N.W.2d 676.

¶ 32.   Viewing the evidence presented at trial in the light most favorable to the State, we conclude that based on the correct interpretation of Wis. Stat. § 346.04(3) there was, indeed, sufficient evidence for a reasonable finder of fact to have found guilt beyond a reasonable doubt. The jury heard Klinkhammer's, Hanson's, and Ms. Derby's accounts of the initial traffic stop and Hanson's flight from the scene, as well as the accounts of passersby Anthony Bowen and Deputy Sturino, who attempted to stop Hanson a second time. Hanson was given the opportunity to present testimony of his fear during the initial encounter, and he discussed how overwhelming and frightening the entire event was for him. The jury considered all the evidence, weighed it against proper legal standards, and reached findings that were reasonable. We will not disturb those findings on review.

2.   Wisconsin Stat. § 904.04(1)(b)

¶ 33.   Hanson also argues that the circuit court erred by excluding evidence of Klinkhammer's character. Hanson sought to admit a school principal's testimony that, when Klinkhammer served as a school liaison officer, he demonstrated a "confrontational, aggressive, and hot-tempered" character. Hanson argues that Klinkhammer, as the "object" of Hanson's alleged crime of fleeing, was a "victim" within the meaning of Wis. Stat. § 904.04(1)(b), and therefore, evidence of the deputy's confrontational character is admissible to show that he acted in conformity with that "pertinent trait of character."

261

¶ 34.   Hanson's argument requires us to interpret the meaning of "victim" under Wis. Stat. § 904.04(1)(b) where a violation of Wis. Stat. § 346.04(3) is alleged. This is so because, without a determination that an exception under § 904.04(1) applies, propensity evidence is inadmissible in the context of a criminal trial. *See* § 904.04(1); *see also State v. Sullivan,* 216 Wis. 2d 768, 783, 576 N.W.2d 30 (1998).

¶ 35.   Wisconsin Stat. § 904.04(1) provides in relevant part:

(1) CHARACTER EVIDENCE GENERALLY. Evidence of a person's character or a trait of the person's character is not admissible for the purpose of proving that the person acted in conformity therewith on a particular occasion, except:  . . . .

(b) Character of victim. Except as provided in s. 972.11(2), evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor.

¶ 36.   Typically, where a crime involves a victim, such as in the case of an assault or a homicide, the defendant is given "[w]ide latitude" to use evidence of the victim's character to show action "in conformity therewith." *See* 7 Daniel D. Blinka, *Wisconsin Practice Series: Wisconsin Evidence* § 404.5 (3d ed. 2008). But as Professor Blinka notes, where no "victim" exists, the general ban on propensity evidence will be enforced. *See id.; see also* Wis. Stat. § 904.04(1).

¶ 37.   Therefore, the precise question we must decide is whether, under Wis. Stat. § 904.04(1)(b) in the context of a fleeing charge under Wis. Stat. § 346.04(3),

a traffic officer from whom a defendant allegedly fled is a "victim" subject to the character evidence exception in § 904.04(1)(b). Although this court has not previously examined this specific question, Hanson directs our attention to *State v. Haase,* 2006 WI App 86, 293 Wis. 2d 322, 716 N.W.2d 526. Hanson contends that in *Haase* the court of appeals held that an officer may be considered a "victim" for purposes of restitution under Wis. Stat. § 973.20. Additionally, Hanson argues briefly that, as a constitutional matter, his right to present a defense requires that he be allowed to introduce evidence of Klinkhammer's character traits. We will discuss these arguments in turn.

¶ 38. In *Haase,* the circuit court had ordered the defendant to reimburse the Dane County Sheriff's Department for the cost of a squad car that was destroyed by fire after officers pursued the fleeing defendant across difficult terrain. *Id.,* ¶ 4. The court of appeals examined three other "victim" cases in which restitution had been awarded, and reaffirmed what it interpreted as the appropriate rule in determining to whom restitution was due. *Id.,* ¶¶ 8–13 (examining *State v. Ortiz,* 2001 WI App 215, 247 Wis. 2d 836, 634 N.W.2d 860, *State v. Howard-Hastings,* 218 Wis. 2d 152, 579 N.W.2d 290 (Ct. App. 1998), and *State v. Schmaling,* 198 Wis. 2d 756, 543 N.W.2d 555 (Ct. App. 1995)).

¶ 39. In *Haase,* the court of appeals denied restitution for the destruction of the department's property. In so doing, the court reasoned that a "direct victim" was required for the recovery of restitution, and that if there were such a victim, it would be the individual law enforcement officers, rather than the sheriff's department. *Id.,* ¶¶ 14–15.

¶ 40. From the reasoning of the court of appeals in *Haase,* Hanson now argues that we should superimpose the court's reasoning about who may be a victim from restitution law onto Wis. Stat. § 904.04(1), an evidentiary statute. We reject this argument. First, we conclude that neither *Haase* nor any of the other restitution cases supports the conclusion that a traffic officer is a "victim" for evidentiary purposes under § 904.04(1)(b) in the context of a fleeing charge under Wis. Stat. § 346.04(3).

¶ 41. Second, the rationale underlying interpretations of the term "victim" in Wis. Stat. § 973.20 is not persuasive when interpreting rules of evidence. This is so because the principles underlying the restitution statute are different from the principles of relevance and prejudice upon which evidentiary rules are grounded. *See* Blinka, *supra,* § 402.01.

¶ 42. Restitution is not grounded in victimhood; rather, it is based on the criminal's destruction of property and the principle that an actor should not be permitted to destroy others' property without being held financially responsible. *See* Wis. Stat. § 973.20(2)(b) ("If a crime considered at sentencing resulted in damage to or loss or destruction of property, the restitution order may require that the defendant . . . pay the owner or owner's designee the reasonable repair or replacement cost."); *see also* Restatement (Third) of Restitution and Unjust Enrichment § 40 cmt. d (2011). Any recovery that a governmental entity would have is, therefore, not grounded in the entity's being a "victim" under § 973.20(1r). Instead, the entity's recovery is based on its ownership (or status as designee) of the property damaged or destroyed.

¶ 43. Moreover, admission of evidence of Klinkhammer's character may have been barred under Wis. Stat. § 904.03, which addresses the exclusion of unfairly prejudicial evidence when a § 904.03 objection has been made. In such a circumstance, the admissibility of evidence is determined by balancing the probativeness of the evidence with the danger of unfair prejudice upon admission. *State v. Head,* 2002 WI 99, ¶ 129, 255 Wis. 2d 194, 648 N.W.2d 413. Here, the circuit court did not rule on the basis of § 904.03. However, admission of evidence of the character that the deputy exhibited as a liaison officer would have added little to the jury's understanding of his actions during the traffic stop, in that it was repetitive of other testimony, and it likely would have confused the jury as to the relevant issues. Therefore, the circuit court properly exercised its discretion when it excluded evidence of Klinkhammer's character.

## C.   Constitutional and Interest of Justice Claims

¶ 44.   We will briefly address Hanson's remaining constitutional right-to-present-a-defense and interest of justice claims, because Hanson has addressed these arguments only in a cursory fashion.

¶ 45.   The right to present a defense is grounded in principles of due process and confrontation, and ensures that criminal defendants are not deprived of legitimate opportunities to challenge the State's theory, and generally to present evidence that could create reasonable doubt in the minds of members of the jury. *See Chambers v. Mississippi,* 410 U.S. 284, 294–95 (1973). That right is limited, though, as this court and the United States Supreme Court have recognized. *See,*

265

*e.g., Taylor v. Illinois,* 484 U.S. 400, 410 (1988) (acknowledging limitations on constitutional right to present a defense, including exclusion of evidence "inadmissible under standard rules of evidence"); *State v. Pulizzano,* 155 Wis. 2d 633, 646–47, 456 N.W.2d 325 (1990) (same). As these and many other cases make clear, the rules of evidence generally have been held to comply with the constitutional right to present a defense. Hanson's challenge does nothing to draw those precedents into question. *See Crawford v. Washington,* 541 U.S. 36, 68 (2004); *Davis v. Washington,* 547 U.S. 813, 822 (2006) (discussing exceptions to the hearsay rule and the right of confrontation).

¶ 46. Finally, Hanson asks this court to order a new trial in the interest of justice, on the theory that the lower courts were not apprised of this court's decision regarding the meaning of Wis. Stat. § 346.04(3). We may order a new trial in the interest of justice when the facts or the law so requires. *See* Wis. Stat. § 751.06; *see also State v. Hicks,* 202 Wis. 2d 150, 159, 549 N.W.2d 435 (1996). Here, because we affirm the prior courts' decisions as to the meaning of that statute, there appears no reason to permit Hanson to present his case to another jury. The interest of justice would be ill-served by such an order.

## III. CONCLUSION

¶ 47. We conclude that the circuit court properly instructed the jury on the requirements of Wis. Stat. § 346.04(3). Similarly, we hold that there does not exist a subjective, good-faith exception to the fleeing law, and that Hanson's opportunity to demonstrate any justification for his behavior was through his self-defense claim, which the jury considered and rejected. Additionally, we conclude that the circuit court was correct to

exclude testimony about the traffic officer's alleged confrontational character because the officer was not a "victim" under Wis. Stat. § 904.04(1)(b). Finally, we conclude that neither the Constitution nor the interest of justice warrants a new trial, as no constitutional infirmities have been raised and the real controversy has, indeed, been tried. Accordingly, we affirm the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 48. ANN WALSH BRADLEY, J. (*concurring*). Although I agree with the majority that Hanson is not entitled to a new trial, I write separately because I am concerned that the majority's discussion of willfulness may be misconstrued in future cases.

¶ 49. The majority begins its statutory interpretation with a correct statement of the law. It acknowledges that "willful is susceptible of different meanings in different contexts." Majority op., ¶ 21. It determines that "the term willful as used in Wis. Stat. § 346.04(3) is defined by examining its use within the context of this specific statute." *Id.*

¶ 50. Later, however, the majority appears to paint with a broader brush. It rejects Hanson's proposed interpretation of the term willful, as used in Wis. Stat. § 346.04(3), because "it neither comports with our interpretation of willful in other contexts since *Preston,* nor does it support the statutory purpose of requiring compliance with directions from known law enforcement personnel." *Id.,* ¶ 25.

¶ 51. This statement could be construed to imply that this court has uniformly interpreted the term "willful" since *State v. Preston,* 34 Wis. 675 (1874). Such an implication would be incorrect. In *Cissell,* a case that

post-dated *Preston* by 90 years, this court stated: "As a general proposition, the word willful cannot be defined without reference to its use in a specific statute. In [*Preston*], we specifically noted that willful is susceptible of different meanings in different contexts." *State v. Cissell,* 127 Wis. 2d 205, 210, 378 N.W.2d 691 (1985). We have stressed that the term "willful" is ambiguous, and that no single definition of willful will be applicable in all statutes. *Dep't Transp. v. Wis. Auto. & Truck Dealers Assn.,* 111 Wis. 2d 80, 87, 330 N.W.2d 159 (1983).[1]

¶ 52. Despite my concerns with the majority's analysis, I agree with its ultimate conclusion in this case. Here, Hanson had his day in court. The jury was instructed that it must find, beyond a reasonable doubt,

---

[1] Additionally, the majority confuses the standard of review. It states that an appellate court "independently review[s] whether the evidence was sufficient to sustain a jury verdict, but in so doing, we view the evidence most favorably to sustaining the conviction." Majority op., ¶ 15. This stated standard is contrary to our well-established precedent. *See State v. Poellinger,* 153 Wis. 2d 493, 506, 451 N.W.2d 752 (1990) (concluding that an appellate court should not review the evidence independently, because doing so would usurp the function of the trier of fact). Also, this standard is self-contradictory. How can a court review the evidence "independently" and, at the same time, "most favorably to sustaining the conviction"?

Later in the opinion, the majority sets forth the correct standard of review. Majority op., ¶ 31 (quoting *Poellinger,* 153 Wis. 2d at 501) ("A conviction based on a jury's verdict will be sustained unless 'the evidence, viewed most favorably to the state and the conviction, is so insufficient in probative value and force that it can be said as a matter of law that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt.' ").

that "[t]he defendant knowingly fled or attempted to elude a traffic officer by willful disregard of the visual or audible signal so as to endanger other vehicles." Hanson did not object to the instruction.

¶ 53. In presenting his theory of self-defense, Hanson was afforded the opportunity to prove that he was justified in disregarding the officer's signal. In finding Hanson guilty, the jury considered and rejected Hanson's assertion that his action was justified. Accordingly, like the majority, I conclude that Hanson is not entitled to a new trial.

¶ 54. SHIRLEY S. ABRAHAMSON, C.J. (*dissenting*). I dissent because the majority opinion reads the words "willful or wanton" out of Wis. Stat. § 346.04(3). Additionally, the majority presents an imbalanced fact section, relying primarily on the law enforcement officer's version of the events rather than telling the whole story. The majority's statement of the facts seems like a subtle attempt to make the legal reasoning more persuasive. I begin by discussing the statute and then try to present the defendant's version of the events so that the reader gets a more balanced statement of the facts.

I

¶ 55. The defendant was charged with felony fleeing an officer in violation of Wis. Stat. § 346.04(3), which provides as follows:

No operator of a vehicle, after having received a visual or audible signal from a traffic officer, or marked police vehicle, shall *knowingly* flee or attempt to elude any traffic officer *by willful or wanton* disregard of such signal so as to interfere with or endanger the operation

269

of the police vehicle, or the traffic officer or other vehicles or pedestrians, nor shall the operator increase the speed of the operator's vehicle or extinguish the lights of the vehicle in an attempt to elude or flee. (Emphasis added.)

¶ 56. The statute is difficult to read. The commas almost seem to have been dropped into the text at random, making the last "nor" clause especially hard to understand in relation to the rest of the subsection.[1] Moreover, there are two different scienters. The statute uses the word "knowingly" and also uses the phrase "willful or wanton." None of these words is defined in the statute or in the jury instructions.

¶ 57. What is clear in Wis. Stat. § 346.04(3), however, is that the legislature explicitly included the words "willful or wanton" preceding, and thus modifying, the words "disregard of such [visual or audible] signal."[2] The words "willful or wanton" cannot be disregarded. Statutes are to be read to give effect to every word; surplusage is to be avoided.[3]

¶ 58. Furthermore, the phrase takes on special importance in Wis. Stat. § 346.04(3), which sets forth three levels of fleeing offenses. The statute defining felony fleeing, § 346.04(3), uses the phrase "willful or wanton." This phrase is omitted in § 346.04(2t), the statute defining misdemeanor fleeing, and is also omit-

---

[1] For a published decision of the court of appeals involving interpretation of Wis. Stat. § 346.04(3), the proper instructions, and the sufficiency of evidence, see *State v. Beamon,* 2011 WI App 131, 336 Wis. 2d 438, 804 N.W.2d 706 (pet. for review filed).

[2] The word "knowingly" precedes and thus modifies the words "flee or attempt to elude."

[3] *Robin K. v. Lamanda M.,* 2006 WI 68, ¶ 16, 291 Wis. 2d 333, 718 N.W.2d 38.

ted in § 346.04(1) and (2), the statutes defining a civil forfeiture.[4] The three levels of fleeing offenses in Wis. Stat. § 346.04 reflect the legislature's intent to graduate the penalties based on the gravity of the fleeing offense. The phrase "willful or wanton" cannot be ignored in light of the legislative scheme of graduated penalties.[5]

¶ 59.  A heightened mental state is one factor that clearly separates felony feeing from the misdemeanor and civil offenses in Wis. Stat. § 364.04.[6] Yet the jury was not instructed about the meaning of the word "willful." Further, the pattern Jury Instructions for Wis. Stat. § 346.04(3) declare that "wanton" "does not add anything substantial to the offense"[7] and simply remove the words "or wanton" entirely from the jury's consideration.[8] Putting aside the appropriateness of ordi-

---

[4] The penalties are set forth in Wis. Stat. § 346.17.

[5] For further discussion of the statutory history of the graduated penalties, see ¶¶ 76–80, *infra*.

[6] There are other differences as well. The misdemeanor is defined as follows: "No operator of a vehicle, after having received a visible or audible signal to stop his or her vehicle from a traffic officer or marked police vehicle, shall knowingly resist the traffic officer by failing to stop his or her vehicle as promptly as safety reasonably permits." Wis. Stat. § 346.04(2t). The felony statute requires fleeing or attempting to elude, as opposed to "resisting." The felony statute also requires some sort of aggravated physical circumstances that are absent from the misdemeanor statute, that is, endangerment or interference with other vehicles, increasing speed, or extinguishing lights. Thus, a heightened mental state is not the only factor that distinguishes misdemeanor from felony fleeing, but it should not be ignored.

[7] Wis JI—Criminal 2630, note 3.

[8] Jury instructions often include factual alternatives parenthetically, giving circuit courts the option to remove those that are irrelevant, but here "or wanton" was deleted entirely. A

271

narily removing "or wanton" from the jury instructions entirely, I focus on the meaning of "willful." The jury did not receive any instructions about the meaning of "willful," which is an element of the offense. The parties argue the meaning of the word in the present case as a matter of law.

¶ 60. The State argues that "willful" is synonymous with "knowing." Thus the State views the word as redundant and believes the jury was properly instructed.

¶ 61. The majority opinion, ¶¶ 22 and 27, defines "willful" as requiring "a subjective understanding by the defendant that a person known by the defendant to be a traffic officer has directed the defendant to take a particular action, and with that understanding, the defendant chose to act in contravention of the officer's direction." Without saying so, the majority essentially holds that "willful" is synonymous with the legislature's definition of the word "intentional" in the criminal code.[9]

footnote suggests that circuit courts can insert it when necessary, but the assumption is that "or wanton" has little or no meaning and will rarely, if ever, be included. This treatment of "wanton" is problematic because it ignores the plain language of the statute. It is also problematic because "or wanton" helps give meaning to "willful." Why should the Jury Instructions Committee assume that one of the potential required mental states is irrelevant? A jury should know that the statute requires "willful or wanton" conduct and should be instructed on the meaning of those words. The jury should then decide whether a defendant's conduct satisfies either.

[9] Wisconsin Stat. § 939.23(3) defines the word "intentional" as used in chapters 939 to 951 (the criminal code) to mean that the "actor either has a purpose to do the thing . . . or is aware that his or her conduct is practically certain to cause that result." The crime at issue is not part of chapters 939 to 951.

¶ 62. The majority's approach—equating "willful" with "intentional"—is immediately suspect because had the legislature meant for the scienter requirement to be "intentional," it would have used the word "intentional." The majority's approach of equating "willful" with "intentional" seems particularly flimsy when the word "willful" stands next to the word "wanton" in the statute. The positioning of these two words provides a clue that "willful" might require some sort of heightened mental state beyond merely "intentional."

¶ 63. The defendant argues that "willful" disregard of an officer's signal requires more than knowledge or intent to act. "Willful," according to the defendant, requires a heightened intent requirement; it requires a purpose to do wrong *without just cause or without a justifiable excuse.*[10] The defendant urges that a person's reason for disregarding the officer's signal makes a difference under the statute and that he had just cause for disregarding the officer's signal. The defendant asserts that his honest concern for his personal safety was just cause or a justifiable excuse, even though the jury determined that his belief in the need for self defense was not objectively reasonable. The defendant testified that Klinkhammer, the law enforcement officer, had already beaten him and he feared that the officer would beat him again or kill him.

---

[10] Brief and Appendix of Defendant-Appellant-Petitioner at 14. The defendant's brief at 15–16 argues: "Willful or wanton disregard, as used in § 346.04(3), unambiguously encompasses not merely the knowing failure to comply with an officer's signal to stop, but a knowing scorn or flouting of the officer's signal with indifference to the results or some type of evil intent beyond the mere failure to comply. In other words, in this Court's language in *Preston,* []'evil intent without justifiable excuse.' "

¶ 64.  The word "willful" has given courts difficulty over the years and still causes problems for courts.[11] The word is frequently viewed as ambiguous. Indeed, in a 1983 case the court characterized "willful" as "pregnant with ambiguity"[12] and as "inherently ambiguous."[13] No single definition of "willful" necessarily fits all statutes. When a criminal statute is ambiguous, the rule of lenity tells us to interpret the statute in favor of the criminal defendant. *See, e.g., State v. Cole*, 2003 WI 59, ¶ 13, 262 Wis. 2d 167, 663 N.W.2d 700. In the present case, the rule of lenity would direct that the word "willful" means a heightened mental state beyond merely intentional disregard of an officer's signal. The majority opinion adopts the opposite approach, selecting an undemanding definition of "willful."

¶ 65.  Not only does the majority select a definition of "willful" that is problematic given the plain text, the context, and the rule of lenity, but it also selectively chooses precedent and then misapplies its chosen precedent to suggest that the defendant's preferred definition of "willful" is inappropriate.

¶ 66.  The majority correctly states that the word "willful is susceptible of different meanings in different contexts," majority op. ¶ 21 (quoting *State v. Cissell*, 127 Wis. 2d 205, 210, 378 N.W.2d 691 (1985)). However, the majority opinion appears to determine incorrectly that *Cissell's* conclusion (i.e., that "willful" can mean "intentional") applies to all statutes and that *Cissell's*

---

[11] *See generally* Rachael Simonoff, *Ratzlaf v. United States: The Meaning of "Willful" and the Demands of Due Process*, 28 Colum. J.L. & Soc. Probs. 397, 407–09 (1995).

[12] *DOT v. Transp. Comm'n*, 111 Wis. 2d 80, 88–89, 330 N.W.2d 159 (1983).

[13] *DOT*, 111 Wis. 2d at 90.

analysis of "willful" cannot coexist with *State v. Preston,* 34 Wis. 675 (1874). *See* majority op., ¶¶ 22–25, in which the majority treats "precedent since *Preston*" as rejecting *Preston.* According to the majority at ¶ 25, the defendant's definition of "willful" does not "comport[] with our interpretations of willful in other contexts since *Preston.*" The majority errs.

¶ 67. The only precedent the majority cites for its position that "willful" is the equivalent of "intentional" is *Cissell,* and that is slim precedent indeed compared to the multitude of earlier cases defining "willful" differently in various contexts.

¶ 68. The *Cissell* court carefully defined the issue before it as "whether willful requires proof of a different state of mind than intentional when both terms are used in the two criminal statutes under consideration." *Cissell,* 127 Wis. 2d at 211. The *Cissell* court then answered the question with regard to these statutes, stating that although one statute used the word "willfully" and the other "intentionally," the two words in the two statutes (both governing neglecting or failing to support a child) carried the same meaning.

¶ 69. In contrast to *Cissell,* the statute at issue in the present case does not use both "willful" and "intentional" as the statutes in the *Cissell* case did. The application of *Cissell* to the present case is questionable.

¶ 70. Further, it is inexplicable how the majority leaps from *Cissell's* determination that "willful" can mean "intentional" in one statutory context to a conclusion that the defendant's definition of "willful" is incorrect in the context of Wis. Stat. § 346.04(3).

¶ 71. *Cissell* is not, as the majority opinion would have you believe, the seminal case on the definition of "willful."

275

¶ 72. *Cissell* is a sound case. It seems sensible that in certain contexts "willful" means "intentional."[14] "Willful" may, however, also mean something other than "intentional," as the *Preston* court explained long ago. In 1983, the court reaffirmed *Preston,* declaring that "*Preston* makes clear that there is no one and certain meaning that can be ascribed to 'wilful' which will in all cases convey its meaning."[15]

¶ 73. Wisconsin case law demonstrates that the majority opinion, ¶ 25, misstates our precedent when it claims that the defendant's interpretation of willful does not "comport[] with our interpretations of willful in other contexts since *Preston.*"

¶ 74. Diverse authorities support the notion that the word "willful" has different meanings in different contexts, just as the *Cissell* and *Preston* courts declared. "Willful" may require an "evil" intent.[16] "Willful" may

---

[14] The legislature has shown, however, that it knows the difference between "willful" and "intentional." *See* Legislative Council Note to § 11, ch. 257, Laws of 1979 (stating that the revision of the contempt of court statute removed the words " 'wilful and intentional' in the definition [of contempt and substituted] . . . the word 'intentional' . . . because the council believe[d] that although conduct must be intentional to constitute contempt, *the higher standard* of 'wilful' is inappropriate" (emphasis added)).

[15] *DOT,* 111 Wis. 2d at 87.

[16] *See, e.g., Bicknese v. Sutula,* 2003 WI 31, ¶ 19, 260 Wis. 2d 713, 660 N.W.2d 289 (holding that an exception to sovereign immunity that refers to "malicious and willful conduct . . . should only apply to ill-intentioned acts, as opposed to all 'intentional' actions"); *Brown v. State,* 137 Wis. 543, 549, 119 N.W. 338, 340 (1909) (holding that "willfully," "when used to describe acts which shall be punished criminally . . . includes, in addition to mere purpose to do the act, a purpose to do wrong . . . involv[ing] evil intent or legal malice, according to

mean an intent to do a wrongful act.[17] "Willful" may also mean, as the defendant urges, the purpose to do a wrongful act without just cause or without a justifiable excuse.[18] I conclude this latter meaning of "willful" is used in Wis. Stat. § 346.04(3).

¶ 75. This meaning comports with the statutory history and statutory purpose of Wis. Stat. § 346.04 as a whole. The majority opinion zeroes in on protecting the public from unsafe driving and fostering cooperation with law enforcement and argues that its reading

the great weight of authority"); *see also* 15 Wis. Op. Att'y Gen. 239 (1926) (" 'Wilful' includes, in addition to mere purpose to do [the] act, purpose to do wrong, and involves evil intent or legal malice.").

[17] *See, e.g., Century Shopping Ctr. Fund I v. Crivello,* 156 Wis. 2d 227, 238, 456 N.W.2d 858 (Ct. App. 1990) (holding that one who acts willfully "acts volitionally and with intent to accomplish the unlawful result").

The United States Supreme Court has adopted a similar definition of "willful" on at least one occasion. *See Ratzlaf v. United States,* 510 U.S. 135, 137 (1994) ("To establish that a defendant "willfully violat[ed]" [a] law, the Government must prove that the defendant acted with *knowledge that his conduct was unlawful.*" (emphasis added)). A later statutory revision eliminated the requirement of willful violation. *See United States v. Zehrbach,* 47 F.3d 1252, 1261 (3d Cir. 1995).

*See also Black's Law Dictionary* 1737 (9th ed. 2009) (noting that it has been said repeatedly that willful means only intentionally or purposely, but that "it has been stated with equal repetition and insistence that the requirement added by such a word is not satisfied unless there is a bad purpose or evil intent").

[18] *See First Bank Se., N.A. v. Bentkowski,* 138 Wis. 2d 283, 290 & n.2, 405 N.W.2d 764 (1987) (recognizing that "[a]n intentional act is not necessarily a wilful one" and that courts have held that willful "connotes the intentional doing of a harmful or unreasonable act without just cause or excuse").

of "willful" will further these goals. But by solely emphasizing this purpose to define "willful," the majority ignores the text and context of the statute and the legislature's creation of a three-tiered structure of fleeing offenses.

¶ 76.   The statutory history supports my interpretation of the word "willful." Wisconsin § 346.04(1), enacted in 1957 Laws of Wisconsin ch. 260, § 1, set forth a non-criminal forfeiture for the failure to obey "any lawful order, signal or direction from a traffic officer."

¶ 77.   Section 346.04(3), a misdemeanor statute, was first enacted in 1965. *See* 1965 Laws of Wisconsin ch. 187, §§ 2, 3. This law provided as follows:

> 346.04(3) No operator of a vehicle, after having received a visual or audible signal from a traffic officer, or marked police vehicle, shall knowingly flee or attempt to elude any traffic officer by wilful or wanton disregard of such signal so as to interfere with or endanger the operation of the police vehicle, or the traffic officer or other vehicles or pedestrians, nor shall he increase the speed of his vehicle or extinguish the lights of his vehicle in an attempt to elude or flee.

¶ 78.   In 1994, the Legislature increased the penalty for a violation of Wis. Stat. § 346.04(3) from a misdemeanor to a felony. 1993 Laws of Wisconsin, ch. 189, § 1. This change in penalty was explained by the Wisconsin Criminal Penalties Study Committee Final Report, Part II.D.4.d., at 57 (Aug. 31, 1999), as follows:

> Until 1994 an act of fleeing that did not result in injury or property damage was a misdemeanor offense. In that year the misdemeanor was elevated to a 2–year felony. Doubtless this occurred because some fleeing episodes, though not resulting in injury or property damage, nonetheless pose great threats to the safety of officers and others and thus deserve felony treatment.

¶ 79. Changing Wis. Stat. § 346.04(3) to a felony left a gap between the civil forfeiture and the felony. The Criminal Penalties Study Committee recommended the gap be filled, observing that "[s]ome episodes are short, don't involve high speed, do not seriously compromise public safety." The Criminal Studies Committee concluded that "a misdemeanor fleeing offense should be incorporated into the fleeing statute for use in those cases when the defendant's behavior is appropriately addressed with a conviction other than at the felony level."[19]

¶ 80. The misdemeanor statute, § 346.04(2t), was created in 2001 Wis. Act 109, §§ 443, 445, to read as follows:

> 346.04(2t) No operator of a vehicle, after having received a visible or audible signal to stop his or her vehicle from a traffic officer or marked police vehicle, shall knowingly resist the traffic officer by failing to stop his or her vehicle as promptly as safety reasonably permits.

¶ 81. This three-tiered penalty structure—civil forfeiture, misdemeanor, and felony—shows that the legislature's purpose was not only to protect the public and foster cooperation with law enforcement, but also to achieve those goals while carefully distinguishing between varying degrees of culpability among offenders. The legislature intended to reserve felony charges for the most culpable offenders, that is, for those who flee by willful or wanton disregard of a signal from an officer, and reading "willful" to require more than intentionality serves the purpose of graduated penalty for increasingly serious offenses. My interpretation of

[19] *See* State of Wisconsin Criminal Penalties Study Committee Final Report at 57 (Aug. 31, 1999).

279

"willful" supports the importance of protecting the public and fostering cooperation with law enforcement without ignoring the statutory history and the legislature's creation of a three tiered structure of fleeing offenses.

¶ 82. The defendant did not have the opportunity to convince the jury that he subjectively, honestly believed that he had just cause to disregard the officer's signal, even though the just cause was not objectively reasonable to support a finding of self-defense. The majority thinks that all that the statute required was that the defendant had the opportunity to convince the jury that self-defense was objectively reasonable. I disagree.

¶ 83. The majority opinion fails to comprehend the difference between self-defense which has both a subjective and an objective component[20] and the element of "willful" in the statute that has only a subjective component. *See* majority op. ¶ 29, n.7.

¶ 84. The error here is that the jury was not given an opportunity to consider the evidence using the proper legal standards. In this context, the error prevented the real controversy from being fully tried. I would therefore reverse the conviction and order a new trial.

II

¶ 85. The majority omits almost entirely the defendant's version of the events in an effort to portray the defendant as bizarre, frightening, and irrational, and the law enforcement officer as cool-headed. I set forth details, including those from the defendant's side

[20] *See* Wis JI—Criminal 800 (2001).

of the story, in order to provide a more complete narrative of what the jury heard.[21] Additionally, I highlight a few differences in the testimony of key witnesses, which undermine to some extent the majority's claim that the testimony of the State's key witnesses, Deputy Sheriff Eric Klinkhammer and Randi Derby, "largely corresponds." *See* majority op., ¶ 3 n.4.

¶ 86.   There were three witnesses to begin with— the defendant, Deputy Eric Klinkhammer, a law enforcement officer, and Randi Derby, an intern ride-along. As the majority notes, Klinkhammer did not initiate the traffic stop by activating his lights. Rather, he pulled next to the defendant's vehicle and motioned with his hand for the defendant to pull over. The defendant testified that Klinkhammer drove beside him for about three minutes before "forcefully" gesturing for him to pull over, which he did immediately. Klinkhammer testified that he activated his lights as he pulled behind the defendant and the defendant began to pull over. The defendant, however, testified that he was stopped only by the deputy's hand motion.

¶ 87.   After both vehicles came to a complete stop, the defendant exited his vehicle with his driver's license in hand. Klinkhammer indicated that he used a PA microphone to tell the defendant three times to get back in his car, to no avail. Derby's initial statement did not refer to use of a PA system. At trial, however, she testified that Klinkhammer used the PA and that perhaps the defendant did not hear the PA because of the traffic. The defendant testified that Klinkhammer did not use a PA system.

---

[21] Some of the narrative is taken verbatim from the defendant's opening brief to this court.

¶ 88. All agreed that Klinkhammer then exited the squad car and approached the defendant, telling him to get back into his car. The defendant testified that it was Klinkhammer who was immediately "screaming at the top of his lungs. . . . 'Get back in the car,' really loudly and very frighteningly." The defendant said he was just trying to give Klinkhammer his license and the deputy started "screaming bloody murder." Klinkhammer extended his baton. The defendant said that the situation was disorienting and confusing. He thought it was unusual that he was stopped with a hand motion and not lights.

¶ 89. Derby testified that although she could not hear anything, Klinkhammer was gesturing "get back in your car" and the defendant appeared angry and seemed to be saying "just take [my] driver's license." She did not describe the defendant as acting bizarrely.

¶ 90. The defendant stated that he did not believe he looked like a threat. He had his driver's license in his hand, both hands in plain view and was dressed professionally. The defendant testified that he could not remember how many times he was told to get into his vehicle but that as soon as he realized that the deputy would not take his license and was angry, he got back in his car.

¶ 91. Derby testified that while Klinkhammer was walking back to the squad car with the license, the defendant exited his vehicle a second time. Klinkhammer originally testified to these same facts. Later, however, he admitted that it was not until he had entered his squad car and had begun writing the ticket that the defendant exited his vehicle the second time.

¶ 92. The defendant testified that while he wished he had not, he did exit a second time to ask why he was pulled over and other basic questions. The deputy then

immediately started screaming again at the top of his lungs, "Get back in the car." The defendant said they did have a brief conversation in which Klinkhammer claimed the defendant had been speeding, although the defendant believed he had been driving only a little over 65 and slower than several cars that had passed him. Klinkhammer again displayed the baton and the defendant started back to his car. The defendant testified that Klinkhammer did not at that point tell him he was under arrest.

¶ 93.    All agreed that as the defendant approached his car, Klinkhammer pursued him and grabbed the defendant's shoulder. The defendant's shirt was ripped as he attempted to get in his car and Klinkhammer grabbed him.

¶ 94.    The defendant further testified that as he was following the deputy's direction to return to his car, Klinkhammer grabbed him and struck him in the back of the head with the baton.

¶ 95.    Once in his car, the defendant testified that he was really frightened and immediately called 911. He testified that he carefully drove away and began asking the 911 operator for directions to the nearest police station because he wanted to turn himself in to someone other than Klinkhammer, whom the defendant believed was a threat to his physical safety. The 911 operator urged the defendant to pull over and told him that he was creating a dangerous situation. Eventually the 911 operator started directing the defendant to a police station.

¶ 96.    There are conflicting statements regarding the defendant's driving after exiting I-94. Klinkhammer testified for the first time on redirect that the defendant endangered a vehicle as he exited the interstate at Highway 50. Derby testified that the defendant "drove

283

his vehicle between two vehicles trying to maneuver through traffic" at the end of the off ramp. In contrast, Klinkhammer observed no such maneuvers at the end of the ramp.

¶ 97.  Derby testified that the defendant would have struck a second squad car parked at the bottom of the off ramp if the defendant had not stopped, but he did and then went around it. On cross-examination, Derby admitted that her initial written statement noted that the defendant stopped at the bottom of the off ramp for 'a minute, then drove around the squad car.' Both Klinkhammer and the defendant also testified that the defendant stopped at the bottom of the ramp.

¶ 98.  Deputy Sturino, who drove a second squad car, then testified that the next intersection was so clogged with traffic that the defendant had to stop. However, he also claimed that he stopped the defendant short of the intersection by pulling his squad in front of the defendant's vehicle. Conversely, Klinkhammer and the defendant testified that the defendant was the first person in line at the next stoplight.

¶ 99.  As the defendant was stopped at the second red light, the law enforcement officers surrounded his vehicle and exited their squad cars with guns drawn. The defendant was still on the phone with 911 at the time. Although the officers claimed that they ordered the defendant out of his car several times and warned him that they would break his window if he did not comply, the 911 tape does not pick up any commands from the officers prior to Klinkhammer breaking the defendant's car window with his baton and pulling him from the vehicle.

\* \* \* \*

¶ 100. As I noted at the outset, the majority presents a skewed version of the facts in what seems like a subtle attempt to make its legal reasoning more persuasive. I try to present the defendant's side of the story so readers are aware of what the jury actually heard. Although the jury was not persuaded by the defendant's claim of self-defense, his version of the facts could support his claim that he had an honest, subjective belief that concern for his personal safety was just cause for his flight to the police station, and that his conduct was not "willful" disregard of the officer's signal. The jury might believe the defendant or might conclude the defendant was hoping to game the system. Had the jury been properly instructed, it could have made this decision.

¶ 101. Because the jury was not given an opportunity to decide the appropriate legal issues in the present case, I dissent.