# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE No.: | 2015AP450-CR |
| COMPLETE TITLE: | |

State of Wisconsin,
            Plaintiff-Appellant,
      v.
Adam M. Blackman,
            Defendant-Respondent-Petitioner.

---

REVIEW OF A DECISION OF THE COURT OF APPEALS
Reported at 371 Wis. 2d 635, 886 N.W.2d 94
PDC No:  2016 WI App 69 - Published

---

| | |
|---|---|
| OPINION FILED: | July 7, 2017 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | April 12, 2017 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Fond du Lac |
| JUDGE: | Gary R. Sharpe |

| | |
|---|---|
| JUSTICES: | |
| CONCURRED: | ZIEGLER, J. concurs, joined by GABLEMAN, J. (opinion filed). |
| DISSENTED: | ROGGENSACK, C.J. dissents (opinion filed). |
| NOT PARTICIPATING: | |

ATTORNEYS:

For the defendant-respondent-petitioner, there were briefs by *Dennis M. Melowski* and *Melowski & Associates*, *LLC*, Sheboygan, with whom on the briefs were *Chad A. Lanning* and *Lubar & Lanning*, *LLC*, West Bend, and oral argument by *Dennis M. Melowski.*

For the plaintiff-appellant there was a brief by *Michael C. Sanders*, assistant attorney general, and *Brad D. Schimel*, attorney general, and an oral argument by *Michael C. Sanders.*

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No.  2015AP450-CR
(L.C. No.  2013CF659)

STATE OF WISCONSIN                    :         IN SUPREME COURT

State of Wisconsin,

      Plaintiff-Appellant,

  v.

Adam M. Blackman,

      Defendant-Respondent-Petitioner.

**FILED**

**JUL 7, 2017**

Diane M. Fremgen
Clerk of Supreme Court

---

REVIEW of a decision of the Court of Appeals. *Reversed and remanded.*

¶1   SHIRLEY S. ABRAHAMSON, J.   This is a review of a published decision of the court of appeals reversing a decision of the Circuit Court for Fond du Lac County, Gary R. Sharpe, Judge.[1]   The circuit court granted Adam M. Blackman's motion to suppress the results of a blood test obtained under Wisconsin's

---

[1] State v. Blackman, 2016 WI App 69, 371 Wis. 2d 635, 886 N.W.2d 94.

implied consent law, Wis. Stat. § 343.305(3)(ar)2. (2013-14).[2] The court of appeals reversed the order of the circuit court.

¶2  The issue presented is whether the consequences for refusing to submit to a blood test requested under Wis. Stat. § 343.305(3)(ar)2. were misrepresented to Blackman and, if so, whether that misrepresentation rendered Blackman's consent to the blood draw coerced, that is, not freely and voluntarily given under the Fourth Amendment.[3]  Furthermore, if the court

---

[2] All subsequent references to the Wisconsin Statutes are to the 2013-14 version unless otherwise indicated.

[3] Blackman presented three issues in his petition for review:

1. Whether the circuit court properly suppressed Mr. Blackman's warrantless blood test because he was unconstitutionally coerced into taking the test when he was read the informing the accused form which incorrectly told him that he faced a revocation and other penalties if he refused chemical testing, when he was actually only facing a possible arrest?

2. Whether the circuit court below properly suppressed Mr. Blackman's blood test where Mr. Blackman was unconstitutionally coerced into taking the blood test, under the totality of the circumstances, when he acquiesced to the unlawful assertion by the officer that they take blood samples in cases like his——in addition to being told that he faced a revocation and other penalties if he refused?

3.   Whether   Section   343.305(3)(ar)2.   is unconstitutional on its face and as-applied because it coerces consent to otherwise unconstitutional searches without due process of law?

(continued)

2

concludes that Blackman's consent to the blood draw was not voluntary consent under the Fourth Amendment, the issue becomes whether the court should apply the good faith exception to the exclusionary rule and admit the evidence of the blood alcohol concentration from the blood draw.

¶3 For the reasons set forth, we reverse the decision of the court of appeals, affirm the suppression order of the circuit court, and decline to apply the good faith exception to the exclusionary rule in the instant case.

¶4 The Fourth Amendment ordinarily requires a search warrant for a blood draw unless one of the exceptions to the warrant requirement exists. Birchfield v. North Dakota, 136 S. Ct. 2160, 2173 (2016). In the instant case, the only exception to the warrant requirement at issue is whether Blackman's consent to the blood draw was given freely and voluntarily under the Fourth Amendment. When the legality of a warrantless search is based on the consent of the defendant, that consent must be freely and voluntarily given. State v. Johnson, 2007 WI 32, ¶16, 299 Wis. 2d 675, 729 N.W.2d 182 (citing State v. Phillips, 218 Wis. 2d 180, 197, 577 N.W.2d 794 (1998); Bumper v. North Carolina, 391 U.S. 543, 548 (1968)).

---

We need not and do not address the second and third issues presented. The second issue is substantially the same as the first issue. Our decision on the first issue is dispositive of the instant case. Accordingly, we need not and do not address the third issue challenging the constitutionality of Wis. Stat. § 343.305(3)(ar)2.

¶5 Blackman submitted to a blood draw after Deputy Sheriff John Abler stated the consequences of refusing to submit to a test: Blackman (who was not suspected of a drunk-driving offense) was told that his operating privilege would be revoked if he refused to submit to a blood draw. This information was not accurate. A driver who was not suspected of a drunk-driving offense would prevail at a refusal hearing and his operating privilege would not be revoked. See Wis. Stat. § 343.305(9)(a)5.a.

¶6 For the reasons set forth, we conclude that the State did not prove by clear and convincing evidence that Blackman's consent to the blood draw was valid, that is, that it was freely and voluntarily given under the Fourth Amendment. Because the exclusionary rule's deterrent effect will be served in instant case by suppressing evidence of Blackman's blood test, we decline to apply the good faith exception to the exclusionary rule. The results of Blackman's blood draw are therefore suppressed.

¶7 Accordingly, the cause is remanded to the circuit court to reinstate its order suppressing the evidence and for further proceedings not inconsistent with the decision of this court.

¶8 Our decision is organized as follows:

I. We state the facts.

II. We state the standard of review.

III. Our analysis proceeds as follows:

4

(A) We examine Wis. Stat. § 343.305 to determine whether license revocation is a statutory consequence had Blackman refused to submit to a chemical test under Wis. Stat. § 343.305(3)(ar)2. We conclude that it is not.

(B) We determine whether Blackman's consent to the blood draw was obtained through misrepresentation, rendering his consent coerced, that is, not voluntary and free consent under the Fourth Amendment. We conclude that the consent was obtained through misrepresentation and was coerced.

(C) We determine whether to apply the good faith exception to the exclusionary rule in the instant case. We conclude that the good faith exception does not apply in the instant case.

I

¶9 For purposes of the motion to suppress evidence of Blackman's blood test, the statement of facts is brief and not in dispute.

¶10 At about 10 A.M. on the morning of June 22, 2013, Blackman was driving his car in a northeast direction on County Highway WH in the Town of Taycheedah, Fond du Lac County. Blackman made a left turn onto Lakeview Road. As he was turning, his car collided with a bicyclist travelling in a southwest direction on County Highway WH.

¶11 A witness at the scene explained that Blackman's car collided with the bicyclist, causing the bicyclist to "fly up in

the air, over the car, and land on the roadway." The bicyclist suffered great bodily harm, including a mandibular fracture, fractures to both forearms, rib fracture, sinus fracture, a C6 vertebrae fracture, liver laceration, lung contusion, and a subdural hemorrhaging brain bleed.

¶12 Blackman and the witness both stopped to check on the bicyclist.

¶13 Shortly after the collision, Fond du Lac Deputy Sheriff John Abler was dispatched to the scene.

¶14 Deputy Sheriff Abler testified at the suppression hearing that he had reason to believe that Blackman may have violated a state or local traffic law by failing to yield to the bicyclist and that the bicyclist sustained great bodily harm.

¶15 Deputy Sheriff Abler also testified that before the blood test was administered he did not have reason to believe that Blackman was under the influence of intoxicants. Deputy Sheriff Abler testified in response to questions by the prosecutor about any signs of intoxication as follows:

Q: You noticed no odor of intoxicants coming from him?

A: That's correct.

Q: You noticed no slurred speech

A: That is correct.

Q: You noticed no bloodshot eyes?

A: Correct.

Q: You noticed no glassy eyes?

A: Correct.

Q: You noticed no glassy eyes?

A: Correct.

Q: Okay. You noticed no signs with his balance or coordination?

A: I did not notice anything.

Q: You did not notice any mental impairment on his part, meaning it didn't seem like he was intoxicated or impaired in any way. Would you agree?

A: I agree.

Q: Okay. And, in fact, during your entire contact with Mr. Blackman, you never observed anything that you would have attributed to even the consumption of alcohol. Would you agree?

A: I agree.

¶16 Despite the absence of any signs that Blackman was intoxicated, Deputy Sheriff Abler testified that he explained to Blackman that it was "standard operating procedure for the department, when drivers are involved in accidents of a serious nature, to obtain a blood sample." Blackman went to the hospital and submitted to a blood test. Although Blackman rode in Deputy Sheriff Abler's squad car to the hospital, he was not considered under arrest.

¶17 At the hospital, Deputy Abler read the statutory Informing the Accused Form[4] to Blackman verbatim and requested that Blackman submit to a blood draw. The test of his blood revealed an alcohol concentration of .104.

---

[4] The form is set forth verbatim in Wis. Stat. § 343.305(4).

¶18 The State charged Blackman with multiple offenses: Reckless driving causing great bodily harm,[5] injury by intoxicated use of a vehicle,[6] injury by use of a vehicle with a prohibited alcohol concentration (PAC),[7] operating a motor vehicle while under the influence of an intoxicant (OWI) first offense,[8] and operating a motor vehicle with a PAC.[9]

¶19 At a pretrial suppression hearing, the circuit court suppressed the evidence obtained from the blood draw on the ground that Blackman's consent was obtained by misstatements about the consequences of his refusal to take the test and therefore his consent was coerced.

¶20 According to the circuit court, the Informing the Accused Form under Wis. Stat. § 343.305(4) misstates the law by declaring that the refusal to take a test under § 343.305(3)(ar)2. will lead to revocation of a driver's operating privilege. The circuit court concluded that revocation for a refusal under Wis. Stat. § 343.305(3)(ar)2. would be "statutorily unenforceable" because the issues at a refusal hearing are "limited to" whether the officer had probable cause to arrest for an OWI-related offense, whether the

---

[5] Wis. Stat. § 346.62(4).

[6] Wis. Stat. § 940.25(1)(a).

[7] Wis. Stat. § 940.25(1)(b).

[8] Wis. Stat. § 346.63(2)(a)1.

[9] Wis. Stat. § 346.63(2)(a)2.

officer complied with and read the Informing the Accused form, and whether the driver refused to permit the test.

¶21 Because the Deputy Sheriff had no probable cause to arrest Blackman for an OWI-related offense, the circuit court concluded that "if the statutory scheme does not support a revocation that is threatened, this Court finds that coercion has occurred." The circuit court ordered the evidence of the blood test suppressed.

¶22 The court of appeals reversed the circuit court's order. It ruled, relying on State v. Padley, 2014 WI App 65, 354 Wis. 2d 545, 849 N.W.2d 867, that Blackman "impliedly consented" to the blood draw by driving in Wisconsin; that Blackman had a choice to submit a sample (actual consent) or to withdraw consent (refusal); that Blackman freely chose not to withdraw consent; that the Deputy Sheriff's misstatement of the statute did not "transform Blackman's freely given actual consent under Wisconsin's implied consent law into a coerced submittal." State v. Blackman, 2016 WI App 69, ¶¶2, 5, 10-12, 371 Wis. 2d 635, 886 N.W.2d 94.

¶23 The concurring opinion in the court of appeals acknowledged that Blackman had a "legitimate gripe" about the form read to him. According to the concurrence, even if the form is "technically correct," it is "incomplete and imprecise,

9

no doubt" but "not inaccurate," and the "threat of revocation was real, even if its longer term effects were in doubt."[10]

¶24 For the reasons set forth, we reverse the decision of the court of appeals, affirm the circuit court's order, and remand the cause to the circuit court for further proceedings not inconsistent with the decision of this court.

II

¶25 We first address the standard of review. "Our review of an order granting or denying a motion to suppress evidence presents a question of constitutional fact." State v. Tullberg, 2014 WI 134, ¶27, 359 Wis. 2d 421, 857 N.W.2d 120. We review a question of constitutional fact under a two-step inquiry: First, we will uphold the circuit court's findings of fact unless those findings are clearly erroneous. Second, we conduct an independent, de novo analysis of the application of constitutional principles to the facts found. State v. Robinson, 2010 WI 80, ¶22, 327 Wis. 2d 302, 786 N.W.2d 463.

¶26 We are also asked to interpret and apply Wis. Stat. § 343.305, the implied consent law. Interpretation and application of a statute is generally a question of law that this court decides independently of the circuit court or court of appeals, but benefiting from their analyses. State v. Harrison, 2015 WI 5, ¶37, 360 Wis. 2d 246, 858 N.W.2d 372; State v. DuBose, 2005 WI 126, ¶16, 285 Wis. 2d 143, 699 N.W.2d 582.

---

[10] Blackman, 371 Wis. 2d 635, ¶¶16, 18 (Hagedorn, J., concurring).

III

¶27 As we stated earlier, the issue presented is whether the consequences for refusing to submit to a blood test requested under Wis. Stat. § 343.305(3)(ar)2. were misrepresented to Blackman and, if so, whether that misrepresentation rendered Blackman's consent to the blood draw coerced under the Fourth Amendment. We answer both parts of this question in the affirmative.

A

¶28 We first consider the statutory provisions.

¶29 Under Wis. Stat. § 343.305(2), any person who drives or operates a motor vehicle upon the public highways of Wisconsin is "deemed to have given consent to one or more tests of his or her breath, blood, or urine . . . when requested to do so by a law enforcement officer under [Wis. Stat. § 343.305] sub. (3)(a) or (am) or when required to do so under sub. (3)(ar) or (b)."

¶30 In the instant case, Deputy Sheriff Abler requested Blackman to submit to a blood draw pursuant to Wis. Stat. § 343.305(3)(ar)2., which provides in relevant part as follows:

> If a person is the operator of a vehicle that is involved in an accident that causes the death of or great bodily harm to any person and the law enforcement officer has reason to believe that the person violated any state or local traffic law, the officer may request the operator to provide one or more samples of his or her breath, blood, or urine . . . . <u>If a person refuses to take a test under this subdivision, he or she may be arrested under par. (a)</u>. (Emphasis added.)

11

¶31 Five observations about Wis. Stat. § 343.305(3)(ar)2.:

¶32 First, Wis. Stat. § 343.305(3)(ar)2. provides that if the driver refuses to take a test, he or she may be arrested.[11] Blackman's blood was drawn for a test. He was not arrested.

¶33 Second, Wis. Stat. § 343.305(3)(ar)2. does not provide that if the driver refuses to take a test, the driver's operating privilege will be revoked.

¶34 Third, under Wis. Stat. § 343.305(3)(ar)2., unlike under other provisions of § 343.305, an officer may request a blood draw without having a scintilla of a suspicion that the driver is intoxicated. The officer need have reason to believe only that a driver violated a state or local traffic law and was in an accident that caused great bodily harm.[12]

¶35 Fourth, the State argues that if Blackman were arrested for refusing to take a test under Wis. Stat.

---

[11] Upon a Wis. Stat. § 343.305(3)(ar)2. refusal, the person may be arrested, and asked to submit to a test under § 343.305(3)(a). A refusal under § 343.305(3)(a) will lead to revocation and "other penalties" under § 343.305(9)(a): "If a person refuses to take a test under sub. (3)(a), the law enforcement officer shall immediately prepare a notice of intent to revoke . . . ."

In discussing arrest in the instant case, the circuit court exclaimed: "The question of the century is arrested for what?"

[12] In 2009, the legislature added Wis. Stat. § 343.305(3)(ar)2. to the implied consent law. See 2009 Wis. Act 163. Prior to this Act, a law enforcement officer was authorized to request that a driver submit to a test only after the driver had been arrested for an OWI-related violation or the officer had probable cause to believe the driver was under the influence. See Wis. Stat. § 343.305(3)(a)-(b) (2006-07).

12

§ 343.305(3)(ar)2., and if the officer then requested a sample under § 343.305(3)(a), and if Blackman refused to give a sample, the officer would be required to prepare a notice of intent to revoke Blackman's operating privilege by court order under § 343.305(9)(a). Thus the State argues that revocation is ultimately available under § 343.305(3)(ar)2. through §§ 343.305(3)(a) and 343.305(9)(a).[13]

¶36 Fifth, Wis. Stat. § 343.305(4) sets forth the text that a law enforcement officer shall read to a person from whom a test specimen is requested under Wis. Stat. § 343.305(3)(a), (am), or (ar). We refer to the text as the "Informing the Accused" form.

¶37 Deputy Sheriff Abler read the full text of the form to Blackman as provided in Wis. Stat. § 343.305(4) as follows:

---

[13] Wisconsin Stat. § 343.305(3)(a) provides in relevant part:

[U]pon arrest subsequent to a refusal under par. (ar), a law enforcement officer may request the person to provide one or more samples of his or her breath, blood or urine for the purpose specified under sub. (2). Compliance with a request for one type of sample does not bar a subsequent request for a different type of sample.

Wisconsin Stat. § 343.305(9)(a) provides in relevant part:

(9) Refusal; Notice and Court Hearing. (a) If a person refuses to take a test under sub. (3)(a), the law enforcement officer shall immediately prepare a notice of intent to revoke, by court order under sub. (10) . . . .

Wis. Stat. § 343.305(4) Information.    [At the time that a chemical test specimen is requested under sub. (3)(a), (am), or (ar), the law enforcement officer shall read the following to the person from whom the test specimen is requested]:[14]

You have either been arrested for an offense that involves driving or operating a motor vehicle while under the influence of alcohol or drugs, or both, or you are the operator of a vehicle that was involved in an accident that caused the death of, great bodily harm to, or substantial bodily harm to a person, or you are suspected of driving or being on duty time with respect to a commercial motor vehicle after consuming an intoxicating beverage.

This law enforcement agency now wants to test one or more samples of your breath, blood or urine to determine the concentration of alcohol or drugs in your system.    If any test shows more alcohol in your system than the law permits while driving, your operating privilege will be suspended.    If you refuse to take any test that this agency requests, your operating privilege will be revoked and you will be subject to other penalties.    The test results or the fact that you refused testing can be used against you in court.

If you take all the requested tests, you may choose to take further tests.    You may take the alternative test that this law enforcement agency provides free of charge.    You also may have a test conducted by a qualified person of your choice at your expense.    You, however, will have to make your own arrangements for that test.

If you have a commercial driver license or were operating a commercial motor vehicle, other consequences may result from positive test results or from refusing testing, such as being placed out of service or disqualified.    (Emphasis added.)

---

[14] We include this introductory material to demonstrate that the legislature requires a law enforcement officer to read the full text.    We assume that the law enforcement officer did not read this introductory material to Blackman.

14

¶38 The form differs from Wis. Stat. § 343.305(3)(ar)(2), the statute applicable in the instant case. The form states that if a driver refuses to take any test under § 343.305(3)(ar)2., the driver's "operating privilege will be revoked" and the driver "will be subject to other penalties." The statute states only that if a driver refuses to take any test under § 343.305(3)(ar)2. the driver may be arrested. The form, therefore, does not comport with § 343.305(3)(ar)2. The proper advice to Blackman under § 343.305(3)(ar)2. was that his operating privilege would be revoked if he failed to request a refusal hearing.

¶39 Blackman contends that the text of the form applied to him is erroneous as a matter of law, misrepresented the consequences if he refused a blood test, and rendered his consent to the blood test coerced consent under the Fourth Amendment.

¶40 We agree with Blackman that revocation of the operating privilege is unenforceable against a driver who has refused a test under Wis. Stat. § 343.305(3)(ar)2. if the driver requests a refusal hearing.

¶41 Wisconsin Stat. § 343.305(9)(a) provides the penalty for refusing a post-arrest request for a chemical test under § 343.305(3)(a); this is not the penalty for refusing to take a test under Wis. Stat. § 343.305(3)(ar)2. Section 343.305(9)(a) states in part:

> If a person refuses to take a test under sub. (3)(a), the law enforcement officer shall immediately prepare

15

a notice of intent to revoke, by court order under sub. (10), the person's operating privilege.[15]

¶42 Following receipt of notice of the State's intent to revoke his or her operating privilege pursuant to Wis. Stat. § 343.305(9)(a), the driver may request "a hearing on the revocation within 10 days . . . . If no request for a hearing is received within the 10-day period, the revocation commences 30 days after the notice is issued."  Wis. Stat. § 343.305(9)(a)4. See also § 343.305(10)(a).

¶43 Regarding the refusal hearing, Wis. Stat. § 343.305(9)(a)5. limits the issues as follows:

> 5. [The] issues of the hearing are <u>limited to</u>:
>
> > a. <u>Whether the officer had probable cause to believe the person was driving or operating a motor vehicle while under the influence</u> of alcohol, a controlled substance or a controlled substance analog or any combination of alcohol, a controlled substance and a controlled substance

---

[15] Under Wis. Stat. § 343.305(10)(a), the circuit court shall revoke the driver's license only after it determines that the driver improperly refused to take a test or that the driver did not request a refusal hearing.  Section 343.305(10)(a) provides:

> (a) If the court determines under sub. (9)(d) that a person improperly refused to take a test or if the person does not request a hearing within 10 days after the person has been served with the notice of intent to revoke the person's operating privilege, the court shall proceed under this subsection.  If no hearing was requested, the revocation period shall begin 30 days after the date of the refusal.  If a hearing was requested, the revocation period shall commence 30 days after the date of refusal or immediately upon a final determination that the refusal was improper, whichever is later.

16

> analog, under the influence of any other drug to a degree which renders the person incapable of safely driving, or under the combined influence of alcohol and any other drug to a degree which renders the person incapable of safely driving, having a restricted controlled substance in his or her blood, or having a prohibited alcohol concentration . . . .
>
> b. Whether the officer complied with sub. (4).[16]
>
> c. Whether the person refused to permit the test. . . .   (Emphasis added.)

¶44 Were Blackman to have had a refusal hearing, the issues would have been "limited to" the State proving (a) that the officer had probable cause to believe that the driver was driving or operating a motor vehicle "under the influence"; (b) that the officer complied with reading the Informing the Accused form set forth in § 343.305(4); and (c) that the driver refused to permit the blood test.  If the State did not prove all three issues——and in the instant case, it could not prove that the Deputy Sheriff had probable cause to believe that Blackman was driving or operating a motor vehicle while under the influence of alcohol——Blackman's operating privilege would not have been revoked at the refusal hearing.

¶45 The State challenges this interpretation and application of Wis. Stat. § 343.305.

¶46 The State contends that if the driver refuses a test under Wis. Stat. § 343.305(3)(ar)2., which, as we stated

---

[16] Wisconsin Stat. § 343.305(4) pertains to reading the Informing the Accused form to the driver.

17

previously, is not an OWI-related offense, the officer can arrest the driver. On arrest, the driver comes under § 343.305(3)(a), and the officer can request the driver to submit to a blood test under Wis. Stat. § 343.305(3)(a). If the driver refuses to submit to a blood test under § 343.305(3)(a), the officer may issue a notice of intent to revoke the person's operating privilege. Wis. Stat. § 343.305(9)(a).

¶47 The State acknowledges that Deputy Sheriff Abler did not arrest Blackman, did not proceed under Wis. Stat. § 343.305(3)(a), and did not inform Blackman of each step of the process. But the State argues that the Deputy Sheriff properly informed Blackman of the end result, that is, that Blackman's operating privilege would be revoked.

¶48 The State further contends that Blackman would have had his operating privilege revoked at the refusal hearing because under Wis. Stat. § 343.305(9)(a)5. the only issues that a driver who refused a test under Wis. Stat. § 343.305(3)(ar)2. may raise at a refusal hearing are whether he or she was read the Informing the Accused form and whether he or she actually refused to submit to a chemical test.

¶49 The State supports this interpretation of Wis. Stat. § 343.305(9)(a)5. by relying on the legislative history of 2005 Wis. Act 413 and 2009 Wis. Act 163. According to the State, the legislature did not intend to allow a person from whom a sample is requested under Wis. Stat. § 343.305(3)(ar)2. to challenge probable cause to arrest for an OWI-related offense at a refusal hearing; the legislature intended that the only issues at the

18

refusal hearing would be those listed in § 343.305(9)(a)5.b. and c.: "whether the officer complied with sub. (4)," and "whether the person refused to permit the test." The State argues that the failure to remove an OWI-related probable cause determination from a refusal hearing under § 343.305(3)(ar)2. was a drafting error.[17]

¶50 An alternative interpretation, however, which we adopt, based on the text of the statute, is that the legislature's failure to amend Wis. Stat. § 343.305(9)(a) meant that it did not remove the OWI-related probable cause requirement from a refusal hearing. The text of the statute clearly provides that when an officer requests a blood test pursuant to Wis. Stat. § 343.305(3)(ar)2., the State cannot prevail at the refusal hearing because probable cause is a prerequisite to revocation of an operating license.

¶51 Because the State cannot prevail at a refusal hearing following a driver's denial of a request for a blood test under Wis. Stat. § 343.305(3)(ar)2., the Deputy Sheriff's reading of the text of the "Informing the Accused" form misstated that Blackman's operating privilege will be revoked.

---

[17] The court of appeals seemed persuaded in the instant case that the legislature committed a drafting error. The court of appeals wrote: "The fact that Blackman could have prevailed at a refusal hearing due to the legislature's failure to amend the refusal hearing statute does not transform Blackman's freely given actual consent under Wisconsin's implied consent law into a coerced submittal." Blackman, 371 Wis. 2d 635, ¶12 (emphasis added).

B

¶52 We next determine whether Blackman's consent to the blood draw was obtained through misrepresentation, rendering his consent coerced, that is, not voluntarily and freely given under the Fourth Amendment.

¶53 Blood draws are searches under the Fourth Amendment to the United States Constitution[18] and Article I, Section 11 of the Wisconsin Constitution.[19] See Birchfield, 136 S. Ct. at 2173; Schmerber v. California, 384 U.S. 757, 767 (1966). Warrantless searches are per se unreasonable and are unlawful, subject to a few "clearly delineated" exceptions. State v. Artic, 2010 WI 83, ¶29, 327 Wis. 2d 392, 786 N.W.2d 430.

---

[18] The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

[19] Article I, Section 11 of the Wisconsin Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.

¶54 In the instant case, the State relies on the consent exception to the Fourth Amendment's warrant requirement. The State must prove that consent to the blood draw was "given in fact by words, gestures, or conduct" and that the consent was "voluntary." Artic, 327 Wis. 2d 392, ¶30 (emphasis added). Further, the State must satisfy that burden by clear and convincing evidence. Artic, 327 Wis. 2d 392, ¶32; see also Bumper v. North Carolina, 391 U.S. 543, 548 (1968).[20]

¶55 Whether the consent was given in fact is a "question of historical fact." The finding of the circuit court will be upheld "if it is not contrary to the great weight and clear preponderance of the evidence." Artic, 327 Wis. 2d 392, ¶30. The circuit court found that the defendant consented to providing a blood sample but concluded that the consent was coerced.

---

[20] The State appears to argue that, under the implied consent law, all persons are deemed to have given actual consent to a blood draw when they operate a vehicle on a Wisconsin highway. The State does not argue, however, that law enforcement officers have the authority to compel drivers to submit to a blood draw without a warrant or an exception to the warrant requirement. The State acknowledges that drivers have a "statutory opportunity to withdraw [their] consent." Brief and Supplemental Appendix of Plaintiff-Appellant-Petitioner (State of Wisconsin) at 17. According to the State, a driver's choice when asked to submit to a blood test "is to submit and affirm the consent the person has already given, or refuse and withdraw that consent, and face penalties." Brief and Supplemental Appendix of Plaintiff-Appellant-Petitioner (State) at 10. Withdrawal of consent is not an issue in the instant case.

¶56 If the State establishes consent in fact, the State must prove that the consent was given voluntarily and freely. Schneckloth v. Bustamonte, 412 U.S. 218, 222, 225 (1973). Voluntary consent must be "'an essentially free and unconstrained choice,' not 'the product of duress or coercion, express or implied.'" Artic, 327 Wis. 2d 392, ¶32 (quoting Schneckloth, 412 U.S. at 225, 227 (emphasis added)).[21]

¶57 The determination of voluntariness is based upon an evaluation of the totality of the surrounding circumstances. Artic, 327 Wis. 2d 392, ¶32. Misrepresentation is an important aspect of the totality of circumstances in the instant case.

¶58 In Birchfield, 136 S. Ct. at 2186, the Court concluded that the officer inaccurately advised the accused that the law required him to submit to a warrantless blood test. The Court remanded the cause to the state court to reevaluate the accused's consent in light of the inaccuracy.

¶59 In Artic, quoting State v. Phillips, 218 Wis. 2d 180, ¶33, 577 N.W.2d 794 (1998), the court provided multiple non-exclusive factors, including misrepresentation, to determine whether consent was given voluntarily:

> (1) whether the police used deception, trickery, or misrepresentation in their dialogue with the defendant to persuade him to consent; (2) whether the police threatened or physically intimidated the defendant or

---

[21] See also Bumper v. North Carolina, 391 U.S. 543, 548-49 (1968): "[A] prosecutor [who] seeks to rely upon consent to justify the lawfulness of a search[ ] has the burden of proving that the consent was, in fact, freely and voluntarily given.").

22

"punished" him by the deprivation of something like food or sleep; (3) whether the conditions attending the request to search were congenial, non-threatening, and cooperative, or the opposite; (4) how the defendant responded to the request to search; (5) what characteristics the defendant had as to age, intelligence, education, physical and emotional condition, and prior experience with the police; and (6) whether the police informed the defendant that he could refuse consent.

Artic, 327 Wis. 2d 392, ¶33 (citing Phillips, 218 Wis. 2d at 198-203) (emphasis added).

¶60 Although the most pertinent consideration in the instant case is whether misrepresentation rendered Blackman's consent coerced, we also consider the other factors described in Artic and Phillips.  See Artic, 327 Wis. 2d 392, ¶33.

¶61 Here are the other considerations.  This was Blackman's first OWI offense.  There is nothing in the record to indicate that Blackman was physically intimidated or that Blackman was uncooperative.  The Deputy Sheriff testified that Blackman's response to the request for a blood draw was that he did not specifically agree or disagree or refuse or give any indication that he was going to refuse.[22]  Blackman was informed

---

[22] The prosecutor's question and the Deputy Sheriff's answer at the suppression hearing regarding whether Blackman was coerced into taking a blood test is as follows:

Q: [Prosecutor] . . . Is there anything else you can tell me that would give us some information as to whether or not Mr. Blackman was forced or coerced or threatened in any way to consent to an evidentiary chemical test of his blood?

A: [Deputy Sheriff Abler] No, he was not.  In fact he was very cooperative throughout the whole procedure.

(continued)

23

that he could refuse to take the test.  He was incorrectly informed that his operating privilege would be revoked if he refused the request for a blood draw.

¶62 We therefore address the effect of the Deputy Sheriff's "inaccuracy" or "misrepresentation" of consequences on the validity of Blackman's consent under the Fourth Amendment.

¶63 We conclude that because Blackman's consent was the product of misrepresentation by the State, and under the totality of the circumstances, the State has not carried its burden of proving that Blackman's consent was voluntarily and freely given under the Fourth Amendment.  The State did not

---

The circuit court's questioning of the Deputy Sheriff about Blackman's taking a blood test is as follows:

Q: [The Circuit Court] Did you tell him why you were going to the hospital and why he should ride in your car?

A: [Deputy Sheriff Abler] Well, I'm sure I told him that.  I know I explained our normal procedure is when there is a serious accident like this that we do take blood samples.

Q: Okay.  So he knew he was going to the hospital for a blood sample?

A: Yes, he did.

Q: Did he say anything to you about agreeing to have a blood sample and when you got in the car and before you guys took off to go to the hospital?

A: I don't know that he specifically agreed, but he did not disagree or refuse or give me any indication that he was going to refuse.

24

prove Blackman's consent was the result of "an essentially free and unconstrained choice." Schneckloth, 412 U.S. at 225.

¶64 In the instant case, Deputy Sheriff Abler was directed by statute to read the Informing the Accused form to Blackman. The text of the form advised Blackman that the Deputy Sheriff was requesting to test a sample of Blackman's blood. The form inaccurately advised Blackman of the penalty for refusal. The text of the form inaccurately advised Blackman that his operating privilege would be revoked. This penalty did not apply to Blackman.

¶65 The Deputy Sheriff advised Blackman that the Department's standard operating procedure was to take blood under the circumstances in the instant case. Although the Deputy Sheriff did not tell Blackman that a blood draw would be performed without his consent, Blackman could have drawn this inference from the statement of the Department's policy and could have concluded that he had no real choice but to take a blood test.

¶66 Considering the totality of the circumstances, we conclude that the State failed to meet its burden to prove that Blackman voluntarily and freely consented to the blood draw under the Fourth Amendment. All things considered, Blackman's consent to the blood draw was not voluntary and free, and was not an unconstrained choice; it was the product of coercion, express or implied, and therefore was invalid under the Fourth Amendment.

25

¶67 Thus, the evidence obtained through the blood draw was the result of an unlawful search.

C

¶68 Ordinarily, evidence obtained through an unlawful search is excluded at trial. The exclusionary rule generally serves to "deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." Herring v. United States, 555 U.S. 135, 150-51 (2009). In State v. Dearborn, 2010 WI 84, ¶36, 327 Wis. 2d 252, 786 N.W.2d 97, the court stated the circumstance under which the exclusionary rule applies as follows:

> To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system. As laid out in our cases, the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence.

¶69 The State asks that the results of the blood draw in the instant case be admitted in evidence because Deputy Sheriff Abler acted in good faith.

¶70 Courts have applied the good faith exception and deviated from the exclusionary rule in only a few types of cases and in limited circumstances. The good faith exception has generally been applied when a law enforcement officer has reasonably and objectively relied on settled law (whether statute[23] or binding judicial precedent[24]) that was subsequently

---

[23] Illinois v. Krull, 480 U.S. 340, 349-50 (1987).

26

overruled or a warrant that was subsequently invalidated[25] or that was based on erroneous information resulting from isolated police negligence attenuated from the arrest.[26]

¶71 The parties cite no case, and we have found none, applying the good faith exception to the exclusionary rule to a situation in which a law enforcement officer followed the requirements of a statute and gave an accused inaccurate information upon which the accused's coerced consent was based.

¶72 The State argues that Deputy Sheriff Abler's conduct and the Department's procedure complied with the statute; that a

---

[24] Davis v. United States, 564 U.S. 229, 241 (2011).

[25] Arizona v. Evans, 514 U.S. 1, 14 (1995); United States v. Leon, 468 U.S. 897, 918 (1984).

Although the court often interprets Article I, Section 11 of the Wisconsin Constitution in conformity with the interpretation of the Fourth Amendment, in State v. Eason, 2001 WI 98, ¶3, 245 Wis. 2d 206, 629 N.W.2d 625, the court adopted a "Leon-plus" good faith rule relying on Article I, Section 11 of the Wisconsin Constitution.  The court concluded that this provision "guarantees more protection than the Fourth Amendment provides under the good faith exception as adopted in Leon:"

> We hold that the good faith exception applies where the State has shown, objectively, that the police officers reasonably relied upon a warrant issued by an independent magistrate.  The burden is upon the State to also show that the process used in obtaining the search warrant included a significant investigation and a review by either a police officer trained and knowledgeable in the requirements of probable cause and reasonable suspicion, or a knowledgeable government attorney.  (Emphasis added.)

[26] Herring v. United States, 555 U.S. 135, 137, 147-48 (2009).

law enforcement officer cannot be expected to question a legislative enactment or Department procedure; that the exclusionary rule is not intended to deter the legislature; and that the exclusionary rule's deterrent effect on law enforcement conduct would not be served by suppressing the evidence of the blood draw in the instant case.

¶73 The State's argument is not persuasive. The error in the instant case is not an error attributable solely to the legislature. Nor does the instant case present an isolated or nonrecurring error in the criminal justice system. It evinces the potential of a "recurring or systemic" error, a widespread error, affecting the rights of an accused. The accused has a constitutional right under the Fourth Amendment, unless another exception to the warrant requirement exists, for law enforcement officers to obtain his or her free and voluntary consent to a blood draw or to obtain a search warrant for the blood draw. Unless the evidence in the instant case is suppressed, law enforcement officers across the state will continue to read the Informing the Accused form to accuseds in the same situation as Blackman without providing correct information to provide the basis for the accused's voluntary consent.

¶74 The exclusionary rule's deterrent effect will be served if the evidence in the instant case is suppressed.

¶75 The application of the good faith exception to the exclusionary rule is not appropriate in the instant case. Accordingly, we conclude that the evidence of Blackman's blood test should be suppressed.

¶76 The dissent contends that Washburn County v. Smith, 2008 WI 23, 308 Wis. 2d 65, 746 N.W.2d 243, contravenes our holding that the misrepresentation in the Informing the Accused Form requires suppression of the evidence and that the good faith exception to the exclusionary rule does not apply in the instant case. The dissent errs. Smith is inapposite.

¶77 In Smith, unlike in the instant case, the information in the Informing the Accused Form was not challenged as incorrectly applying to the accused. Smith, 308 Wis. 2d 65, ¶¶65, 77.

¶78 The alleged misrepresentation in Smith was that the law enforcement officer gave additional information that was incorrect to the accused from whom a breath test (not a blood test) was requested. Smith, 308 Wis. 2d 65, ¶¶54, 78. The accused did not take the breath test and faced a refusal hearing.

¶79 The accused, who held a Louisiana driver's license, argued at the refusal hearing that the deputy gave him incorrect information about the penalties under Louisiana law and that therefore his refusal was justified. The court was unconvinced by the accused's argument about Louisiana law. The court held that the Informing the Accused Form accurately stated Wisconsin law and that neither the deputy nor the accused believed that the deputy was stating Louisiana law. Smith, 308 Wis. 2d 65, ¶¶81, 82.

¶80 The accused also alleged that the deputy gave him an additional item of misinformation. Because no factual finding

29

had been made about this allegation, the court assumed for purposes of its decision that the deputy misinformed the accused that he would be entitled to a refusal hearing within 10 days. Smith, 308 Wis. 2d 65, ¶84. The correct information was that the accused could request a refusal hearing within 10 days.

¶81 Under the applicable law at that time, in order to prevail, the accused in the Smith case had the burden to make a prima facie showing that the deputy's erroneous statement about the timing of the refusal hearing contributed to his refusal to submit to the breath test. Smith, 308 Wis. 2d 65, ¶86. The accused failed to make this essential showing. Accordingly, the court concluded that the accused improperly refused to submit to the breath test under the Implied Consent Law. Smith, 308 Wis. 2d 65, ¶¶87-89.

¶82 The Smith court did not address the driver's Fourth Amendment rights regarding a breath or blood test, the concept of voluntary consent under the Fourth Amendment, or the exclusionary rule. These issues were not raised in the Smith decision. The Smith case is not pertinent to the instant case.

* * * *

¶83 For the reasons set forth, we conclude that the State did not prove by clear and convincing evidence that Blackman's consent to the blood draw was valid, that is, that it was voluntarily and freely given under the Fourth Amendment.

¶84 Because the exclusionary rule's deterrent effect will be served by suppressing the evidence of Blackman's blood test, we decline to apply the good faith exception to the exclusionary

30

rule.    The results of Blackman's blood draw are therefore suppressed.

¶85  Accordingly,  the  cause  is  remanded  to  the  circuit court  to  reinstate  the  order  suppressing  the  evidence  and  for further  proceedings  not  inconsistent  with  the  decision  of  this court.

*By the Court*.——The  decision  of  the  court  of  appeals  is reversed and the cause remanded.

¶86 ANNETTE KINGSLAND ZIEGLER, J. *(concurring).* I join the court's opinion with a few exceptions and a few caveats. Because I am able to join most, but not all, of the court's opinion, I write to provide further clarity of that opinion.

¶87 At the outset, I am compelled to clarify what was and was not the "misrepresentation" in this case. Here, the term "misrepresentation" is being used in the context of law enforcement reading a required form completely accurately but the standard form that was read verbatim inaccurately stated the law. This court has framed that misstatement of law by using the phrase "misrepresentation." To be clear, there are a number of occasions where law enforcement may appropriately use "misrepresentations" in the context of an investigation or otherwise. See, e.g., Lewis v. United States, 385 U.S. 206, 208-09 (1966) ("Indeed, it has long been acknowledged by the decisions of this Court that, in the detection of many types of crime, the Government is entitled to use decoys and to conceal the identity of its agents." (citations omitted)); United States v. Peters, 153 F.3d 445, 464 (7th Cir. 1998) (Easterbrook, J., concurring) ("Police engage in deceit all the time in order to induce suspects to reveal evidence. . . . Deception plays an important and legitimate role in law enforcement.").

¶88 In the case at issue, the word "misrepresentation" is used not because law enforcement spoke in an effort to induce coercion, but rather, is used in the literal sense that the language on the form read misrepresented what the law actually was. Thus, it is not law enforcement action that caused the

1

misrepresentation, but rather the inaccuracy of the form, properly read verbatim, that inaccurately informed the defendant of the state of the law. The phrase "misrepresentation" is used in the opinion but the use of that term should not be confused with a more typical scenario involving misrepresentations made by law enforcement.[1] The opinion should not be read to suggest that any misrepresentation by law enforcement would automatically render a subsequent action to be deemed coerced. One does not automatically influence the other.

¶89 Second, I further write to clarify that the court's opinion should not be read as inconsistent with my view of the constitutional theory behind Wisconsin's implied consent law. See, e.g., State v. Howes, 2017 WI 18, ¶¶52-87, 373 Wis. 2d 468, 893 N.W.2d 812 (Gableman, J., concurring). The court sensibly does not opine on this matter in this case and I write to alert the reader that this decision should not be interpreted as doing so.

¶90 Third, I do not join that part of the opinion which discusses the inferences that Blackman might have drawn from one of Deputy Abler's statements in this case. See majority op., ¶65. Specifically, Deputy Abler's reference to department policy to draw blood and what Blackman might have thought that

---

[1] When it comes to misrepresentations by law enforcement, the proposition that misrepresentation is or is not deemed to be permissible oversimplifies the reality of when or if a misrepresentation by law enforcement has been approved by the courts. See, e.g., Lewis v. United States, 385 U.S. 206, 208-09 (1966); United States v. Peters, 153 F.3d 445, 464 (7th Cir. 1998) (Easterbrook, J., concurring).

to mean is a disputed fact between the parties. Resolution of the meaning of the statement is not necessary to the disposition of this case. If we were to review this, the inquiry would not be as subjective as the court's discussion might seem. Cf., e.g., Florida v. Jimeno, 500 U.S. 248, 251 (1991) ("The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness——what would the typical reasonable person have understood by the exchange between the officer and the suspect?").

¶91 Fourth, the good faith exception applies in specific, narrowly-defined circumstances. See, e.g., State v. Dearborn, 2010 WI 84, ¶46, 327 Wis. 2d 252, 786 N.W.2d 97 ("[U]nder our holding today, the exclusionary rule is inappropriate only when the officer reasonably relies on clear and settled precedent. Our holding does not affect the vast majority of cases where neither this court nor the United States Supreme Court have spoken with specificity in a particular fact situation."); Davis v. United States, 564 U.S. 229, 238-39 (2011) (listing cases). In my view, the facts of this case do not constitute one of the rare occasions where the good faith exception applies. This is not a case, for example, where law enforcement followed the law in existence at the time, where the error will not occur in the future given the current state of the law, and where future action is already deterred because of the correction in the law. Instead, the law enforcement officer inaccurately explained existing law, and this error might continue to occur in the future such that the deterrent effect will be served by the

3

suppression of evidence. While deterrent effect is not the sole consideration, I am able to join the court's discussion understanding that although "[r]eal deterrent value is a 'necessary condition for exclusion,' . . . it is not 'a sufficient' one. The analysis must also account for the 'substantial social costs' generated by the rule." Id. at 237 (citation omitted) (quoting Hudson v. Michigan, 547 U.S. 586, 596 (2006)). The result reached in this case is not inconsistent with this approach.

¶92 Fifth, while I agree with the court that the information given to Blackman in the instant case was inaccurate under the law, I do not necessarily join the court's inference that certain advice should be given to Blackman under Wis. Stat. § 343.305(3)(ar)2. We need not go that far.

¶93 For the foregoing reasons, I respectfully concur.

¶94 I am authorized to state that Justice MICHAEL J. GABLEMAN joins this opinion.

4

¶95 PATIENCE DRAKE ROGGENSACK, C.J. *(dissenting)*. Wisconsin's legislature repeatedly has enacted laws to lessen the carnage that drunk drivers inflict on those who use Wisconsin roads. Today, the majority opinion overturns legislation that holds those who drive with a prohibited alcohol concentration responsible for the injuries they cause by violating a traffic law when their intoxication is not readily apparent.

¶96 The majority opinion errs for three reasons: Adam M. Blackman's consent to blood tests was not obtained by law enforcement coercion; the majority opinion misinterprets the relevant statutes; and Deputy Sheriff Abler acted with a good faith belief that he was doing what the statutes required. Stated more fully: (1) Deputy Abler's reading the Informing the Accused form to Adam Blackman was not sufficient to overcome Blackman's free will such that the reaffirmation of his consent to evidentiary tests was coerced rather than voluntary; (2) the controlling statutes, correctly interpreted, comport with the deputy's reading the Informing the Accused form to Blackman; and (3) Deputy Abler, in good faith, read what he believed the statutes required. Accordingly, I would affirm the court of appeals, and I respectfully dissent from the majority opinion.

## I. BACKGROUND

¶97 The majority opinion ably sets forth most of the factual background of this controversy, so I shall relate only those facts necessary to attuning the reader to my discussion that follows.

1

¶98 At approximately 10:00 in the morning while driving his automobile, Blackman made a left-hand turn from a county highway onto an intersecting street. In so doing, he crossed the path of an oncoming bicyclist, who collided with the right side of Blackman's car causing great bodily harm to the bicyclist.

¶99 While medical personnel were attending to the injured bicyclist, Deputy Sheriff Abler spoke with Blackman, who had remained at the scene of the accident. Abler testified that he believed that Blackman violated a traffic law by not yielding the right-of-way to the bicyclist when he made his left-hand turn.

¶100 Because of the great bodily harm that the bicyclist suffered, Abler asked Blackman to provide a blood sample. Blackman agreed and was taken to a local hospital for the blood draw. At the hospital, Abler read Blackman the Informing the Accused form. Wisconsin Stat. § 343.305(4) directs that it be read before a chemical evidentiary test is undertaken based on a driver's alleged traffic violation that causes great bodily harm to another person, i.e., a violation of Wis. Stat. § 343.305(3)(ar)2.

¶101 The Informing the Accused form describes civil penalties that may follow from refusing to permit a chemical test. The following questions were asked of the deputy about his interactions with Blackman and Blackman's consent to the evidentiary test in response to the Informing the Accused form.

> Q Do you recall, did Mr. Blackman consent to an
>   evidentiary chemical test of his blood?

2

A    Yes, he did.

Q    Okay.    At that time do you recall, did Mr.
     Blackman have any questions for you about the
     nature of that form?

A    No, I don't recall any questions.

Q    Okay.    At the time that was read, was Mr.
     Blackman confined in any way?

A    No, other than the fact that we were just sitting
     in a room at the hospital.

Q    Okay.   Is there anything else that you can tell
     me that would give us some information as to
     whether or not Mr. Blackman was forced or coerced
     or threatened in any way to consent to an
     evidentiary chemical test of his blood?

A    No, he was not.   In fact, he was very cooperative
     throughout the whole procedure.

. . . .

     THE COURT:  Did you tell him why you were going
to the hospital and why he should ride in your car?

     THE WITNESS:  Well I'm sure I told him that.   I
know I explained our normal procedure is when there is
a serious accident like this that we do take blood
samples.

     THE COURT:  Okay.  So he knew he was going to the
hospital for a blood sample?

     THE WITNESS:  Yes, he did.

     THE COURT:  Did he say anything to you about
agreeing to have a blood sample and when you got in
the car and before you guys took off to go to the
hospital?

     THE WITNESS:  I don't know that he specifically
agreed, but he did not disagree or refuse or give me
any indication that he was going to refuse.

¶102 Blackman, who was 20 years of age on the date he was

requested to give a blood sample, reaffirmed his consent and his

3

blood was drawn.[1]  The tests showed he had a .104 blood alcohol concentration.  He was charged with several crimes that related to his unlawful blood alcohol concentration and the great bodily harm the bicyclist suffered.

¶103 Blackman moved to suppress the results of his blood test, claiming that his consent was not valid because the deputy misinformed him that he faced the civil penalty of license revocation if he refused, when he actually faced only an arrest for refusing the blood draw.  He also argued that if the implied consent law applied to him, and if his consent was valid, Wis. Stat. § 343.305(3)(ar)2. was unconstitutional, both facially and as applied to him.

¶104 The circuit court concluded that Abler did not misinform Blackman "because the potential for revocation was ultimately available through section (3)(a) if the refusal continued."  However, the circuit court granted Blackman's motion to suppress because it concluded Blackman's consent was coerced when he was told that if he refused to permit a blood draw his operating privileges would be revoked.  The court based this "coercion" on its conclusion that revocation for refusal under Wis. Stat. § 343.305(3)(ar)2. would be "statutorily unenforceable."  The court concluded that Wis. Stat. § 343.305(9)(a)5.a. required the State to prove that Abler had probable cause to arrest Blackman for a driving while

---

[1] The record reflects that Adam Blackman was born November 23, 1992 and his blood sample was drawn on June 22, 2013, the date of the offenses.

4

intoxicated offense when the deputy had no facts to support probable cause at the time the blood sample was taken.

¶105 The court of appeals reversed. It concluded that Blackman was correctly informed that if he withdrew the consent he first provided by driving on the Wisconsin roadways and refused to submit to the requested blood draw, his operating privileges would have been revoked. State v. Blackman, 2016 WI App 69, ¶1, 371 Wis. 2d 635, 886 N.W.2d 94.

¶106 The majority opinion disagrees with the court of appeals and suppresses the results of Blackman's blood test.

## II. DISCUSSION

### A. Standard of Review

¶107 Whether Blackman's reaffirmation of his consent to search was voluntarily given, in contrast to being obtained by law enforcement coercion, is a question of constitutional fact. State v. Phillips, 218 Wis. 2d 180, 195-96, 577 N.W.2d 794 (1998). We apply a two-step process to make this determination. Id. at 191. Historical facts relevant to consent are affirmed unless clearly erroneous. Id. at 190. Voluntary consent is consent "given in the absence of duress or coercion, either express or implied." Id. at 197 (citing Schneckloth v. Bustamonte, 412 U.S. 218, 248-49 (1973)). Accordingly, voluntariness is a question of law that we decide after considering the totality of the circumstances. Id. at 198 (citing Schneckloth, 412 U.S. at 226)). The totality of circumstances include "both the circumstances surrounding the consent and the characteristics of the defendant." Id. (citing

5

State v. Xiong, 178 Wis. 2d 525, 534-36, 504 N.W.2d 428 (Ct. App. 1993)).

¶108 This case also involves statutory interpretation and application. These are questions of law that we independently determine. State v. Hanson, 2012 WI 4, ¶14, 338 Wis. 2d 243, 808 N.W.2d 390.

¶109 And finally, whether Deputy Sheriff Abler read the Informing the Accused form to Blackman in good faith such that the exclusionary rule is inapplicable to the results of Blackman's blood tests is also a question of law. State v. Dearborn, 2010 WI 84, ¶33, 327 Wis. 2d 252, 786 N.W.2d 97.

### B. Coercive or Voluntary

¶110 The majority opinion concludes that Blackman's consent given in response to Abler's request for blood tests was not voluntarily given because it was coerced by Abler's reading the Informing the Accused form to Blackman. The form relates that refusal will result in revocation, when Blackman's driving privileges would not have been revoked if he had refused to provide an evidentiary sample.[2] In so concluding, the majority opinion totally ignores the legal principles that come into play when a court assesses whether a defendant's free will has been overcome by law enforcement conduct for purposes of the Fourth Amendment.

### 1. General principles

---

[2] "He was incorrectly informed that his operating privilege would be revoked if he refused the request for a blood draw." Majority op., ¶61.

6

¶111 When the State asserts that a search was consensual, we must determine whether consent was voluntarily given. Phillips, 218 Wis. 2d 180, ¶23. The test for voluntariness of a search is "whether consent to search was given in the 'absence of actual coercive, improper police practices designed to overcome the resistance of a defendant.'" Xiong, 178 Wis. 2d at 532 (quoting State v. Clappes, 136 Wis. 2d 222, 245, 401 N.W.2d 759, 769 (1987)). Mere acquiescence to police authority, such as when police display a search warrant to a defendant and he permits entry into his home, is not coerced consent in the context that Blackman contends occurred herein. Rather, we consider a search done without a warrant that was based on law enforcement's request to search and Blackman's response to that request. Schneckloth, 412 U.S. at 234.

¶112 Whether a defendant's will was overborne such that his consent to search was not voluntary requires us to examine the details of the interactions between law enforcement and the defendant and the characteristics of the defendant. Id. at 226. There is no one factor that will determine whether consent was coerced. As the United States Supreme Court has explained, "The problem of reconciling the recognized legitimacy of consent searches with the requirement that they be free from any aspect of official coercion cannot be resolved by any infallible touchstone." Id. at 229.

¶113 In regard to the interaction between law enforcement and the defendant, we examine whether law enforcement "threatened, physically intimidated, or punished the defendant,"

7

Phillips, 218 Wis. 2d at 199; whether the interactions between law enforcement and the defendant were under cooperative, nonthreatening conditions, id. at 200; whether the consent was the result of custodial interrogation, which the Supreme Court concluded was "inherently coercive" in Miranda v. Arizona, 384 U.S. 436 (1966). Schneckloth, 412 U.S. at 240.

¶114 Some factors relating to the defendant are: his youth, Haley v. Ohio, 332 U.S. 596, 599 (1948); education or lack thereof, Payne v. Arkansas, 356 U.S. 560, 562 (1958); low intelligence or mentally compromised, see Fikes v. Alabama, 352 U.S. 191, 196 (1957); questioning that occurred while defendant was in custody, State v. Michels, 141 Wis. 2d 81, 92, 414 N.W.2d 311 (Ct. App. 1987).

¶115 In a consent-search, it is the State's burden to show voluntariness; however, the State does not have the burden to show that the defendant's consent was "informed consent." Phillips, 218 Wis. 2d at 203 (citing Xiong, 178 Wis. 2d at 532). Stated otherwise, the State has no obligation to prove that the defendant consented to the search knowingly and intelligently, or that the defendant knew he could refuse to permit the requested search. State v. Rodgers, 119 Wis. 2d 102, 109-10, 349 N.W.2d 453 (1984) (citing Schneckloth, 412 U.S. at 229-32).

¶116 Furthermore, the obligation to prove that a defendant's waiver of a trial right is knowing and intelligent is vastly different from the test for assessing the constitutional sufficiency of consent to search. Illinois v. Rodriguez, 497 U.S. 177, 183 (1990). As the United States

8

Supreme Court has explained, "what is generally demanded of the many factual determinations that must regularly be made by agents of the government——whether the magistrate issuing a warrant, . . . or the police officer conducting a search or seizure under one of the exceptions to the warrant requirement—— is not that they always be correct, but that they always be reasonable." Id. at 185.

### 2. Blackman's consent

¶117 There is nothing in the record that shows Abler coerced Blackman. No threats were made to obtain his consent to the blood draw. He was not punished by denying food, drink or rest periods. No coercive, improper police conduct designed to overcome Blackman's free will occurred. All that happened prior to the blood draw was Abler's reading the Informing the Accused form to Blackman.

¶118 In regard to Blackman, he was 20 years of age when the accident occurred. There is nothing in the record that would indicate he did not have the capacity to freely consent, or withdraw consent, for the blood draw. He willingly went to the hospital and permitted blood to be drawn for testing. Deputy Abler said that "he was very cooperative throughout the whole procedure."

¶119 As I will explain below, I have concluded that the deputy properly read the Informing the Accused form, which Wis. Stat. § 343.305(4) requires. However, even if I were to assume that the form should not have been read because Blackman's driving privileges could not have been revoked if he refused to

9

permit the blood test, law enforcement had no obligation to provide additional information to Blackman. Constitutionally sufficient consent may be obtained when the consent is not knowingly and intelligently given. Schneckloth, 412 U.S. at 229-32; Rodgers, 119 Wis. 2d at 109-10; Xiong, 178 Wis. 2d at 532. Reading the form simply gave Blackman a choice: he could say yes or he could say no.

¶120 Furthermore, if reading the Informing the Accused form to Blackman coerced his consent to a blood draw, reading the Informing the Accused form coerces every driver to whom it is read. All have the same choice: say yes or say no. Requiring that accurate consequences of refusing to permit a blood draw are known to the defendant before his consent is held to be voluntary is contrary to Schneckloth, Rogers and Xiong. Knowledge of the consequences of refusal is outside the scope of Fourth Amendment consent to search protections.

¶121 A common example shows the fallacy of the majority opinion's conclusion that Blackman's consent was coerced. Let's assume that a driver belongs to a religious sect that prohibits blood-letting. He refuses to give a blood sample after the Informing the Accused form is read to him. The form is the same for all to whom it is read; yet, if a driver refuses to provide a blood sample based on a sincerely held religious belief, it is likely that his license will not be revoked. See Schmerber v. California, 384 U.S. 757, 771 (1966). Therefore, the form will not provide an accurate description of the consequences of

refusing to provide the requested blood sample for such a driver.

¶122 No coercion forced Blackman to provide a blood sample. Coercion requires unlawful police conduct designed to override the free will of a defendant. There is nothing in this record to suggest unlawful police conduct; and there is nothing in this record to suggest that this 20-year-old man did not freely and voluntarily consent to the blood test.

## C. Statutory Interpretation

¶123 Proper interpretations of Wis. Stat. § 343.305 and its subsections show that the deputy correctly followed directives established by the legislature, which included reading the Informing the Accused form, § 343.305(4), and upon refusal, a refusal hearing would have followed, § 343.305(9)(c).

## 1. General principles

¶124 Statutory interpretation begins with the language of the statute. If the meanings of the words chosen by the legislature are plain, ordinarily we stop the inquiry. State ex rel Kalal v. Circuit Court for Dane Cty., 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110. "Plain meaning may be ascertained not only from the words employed in the statute, but also from the context." Prince Corp. v. Vandenberg, 2016 WI 49, ¶17, 369 Wis. 2d 387, 882 N.W.2d 371.

¶125 Interpreting a statute in context requires that we do not interpret statutory language in isolation, but rather in relation to surrounding and closely-related statutory provisions. Id. Here, I interpret the subsections of Wis.

11

Stat. § 343.305 as they relate to each other within Wisconsin's statutory scheme of implied consent.[3]

## 2. Relevant Statutes

¶126 Wisconsin Stat. §§ 343.305(3)(ar)2., 343.305(4), and 343.305(9) are implicated by Blackman's arguments that the majority opinion finds persuasive.[4] Accordingly, I interpret those provisions in the context of Wisconsin's implied consent law, as they relate to each other.

¶127 A vehicle operator whom a law enforcement officer has reason to believe committed a violation of a traffic law that caused great bodily harm to another may be charged with a violation of Wis. Stat. § 343.305(3)(ar)2. An alleged violation of § 343.305(3)(ar)2. permits a law enforcement officer to request the vehicle operator to provide one or more samples of breath, blood or urine. § 343.305(3)(ar)2. There is no dispute that that interpretation is what the statute plainly provides.

¶128 In regard to a request for samples to test for alcohol concentration, Wis. Stat. § 343.305(4) states in relevant part:

> At the time that a chemical test specimen is requested under sub. (3)(a), (am), or (ar), the law enforcement officer shall read the following to the person from whom the test specimen is requested:

---

[3] I note that the "purpose behind the implied consent law is to combat drunk driving 'by facilit[ating] the gathering of evidence against drunk drivers.'" State v. Piddington, 2001 WI 24, ¶17, 241 Wis. 2d 754, 623 N.W.2d 528 (quoting State v. Neitzel, 95 Wis. 2d 191, 203, 289 N.W.2d 828 (1980)).

[4] Majority op., ¶¶30, 44.

> You . . . are the operator of a vehicle that was involved in an accident that caused the death of, great bodily harm to, or substantial bodily harm to a person . . . .
>
> This law enforcement agency now wants to test one or more samples of your breath, blood or urine . . . . If you refuse to take any test that this agency requests, your operating privilege will be revoked and you will be subject to other penalties.

The Informing the Accused form, which is read before samples for chemical testing are secured, repeats the statutory admonitions of § 343.305(4). The plain wording of subsec. (4) requires the officer to read the statutory provisions. There is no dispute that the statutory provisions are contained within the Informing the Accused form.

¶129 Where I part company with the majority opinion is in its interpretation of Wis. Stat. § 343.305(9). It is not until there is a refusal and a timely request for a refusal hearing that § 343.305(9) comes into play. Neither of these events occurred in the pending matter. However, given the arguments made to us and the majority opinion's interpretation of the various provisions of subsec. (9), I, too, address § 343.305(9).

¶130 I begin with Wis. Stat. § 343.305(9)(c) because it is the paragraph in subsec. (9) that addresses refusal by a person from whom submission of a sample for testing was requested under subd. (3)(ar)2. Paragraph (9)(c) provides:

> If a law enforcement officer informs the circuit or municipal court that a person has refused to submit to a test under sub (3)(a), (am), or (ar), the court shall be prepared to hold any requested hearing to determine if the refusal was proper. The scope of the hearing shall be limited to the issues outlined in par. (a)5. or (am)5. Section 967.055 applies to any hearing under this subsection.

13

¶131 When a vehicle operator who is not a commercial motor vehicle operator refuses a request to submit a sample for testing based on a suspected violation of Wis. Stat. § 343.305(3)(ar)2., any requested hearing cannot encompass more issues than those identified in subd. (9)(a)5. However, there is nothing in para. (9)(c) that requires all three issues identified in subd. (9)(a)5. to be tried. Rather, the issues that must be tried are whether the officer complied with sub. (4), subd. para. (9)(a)5.b., and whether the person's refusal was due to a physical inability to submit to the requested test because of a cause unrelated to the use of a prohibited substance, subd. para. (9)(a)5.c.

¶132 Wisconsin Stat. § 343.305(9)(c) states that the "scope of the hearing shall be limited to the issues outlined in par. (a)5." It does not say that the issues outlined in para. (a)5. shall be tried.

¶133 When issues to be considered in a claim or a type of review are "limited," no unlisted issues can be considered, but every enumerated issue identified in the list does not have to be tried. For example, in certiorari review the issues are limited to:

> (1) whether the board kept within its jurisdiction; (2) whether it proceeded on a correct theory of law; (3) whether its action was arbitrary, oppressive, or unreasonable and represented its will and not its judgment; and (4) whether the board might reasonably make the order or determination in question based on the evidence.

FAS, LLC v. Town of Bass Lake, 2007 WI 73, ¶8, 301 Wis. 2d 321, 733 N.W.2d 287. However, there is no need to try all four

14

issues in order to prevail; simply proving that the board did not proceed on a correct theory of law is sufficient. Id.

¶134 Furthermore, even though Wis. Stat. § 343.305(9)(a)5.a. permits consideration of whether the officer had probable cause to believe the person was operating a motor vehicle with a prohibited alcohol concentration, nothing in para. (9)(c) requires that issue be tried. A plain reading of subd. (9)(a)5. in the context of Wis. Stat. § 343.305(3)(ar)2. demonstrates that requiring the State to litigate whether the officer had probable cause to believe the driver was impaired or had a prohibited alcohol concentration would make no sense because § 343.305(3)(ar)2. is based on the violation of a traffic law that causes death or great bodily injury, not on apparent intoxication.

### 3. Application of statutes to Blackman

¶135 Deputy Abler had reason to believe that Adam Blackman violated a traffic law by failing to yield the right-of-way to oncoming traffic, which caused great bodily harm to another. Accordingly, Blackman was alleged to have violated Wis. Stat. § 343.305(3)(ar)2. There is no question that the bicyclist suffered great bodily harm and no question that it was pursuant to § 343.305(3)(ar)2. that Abler requested that Blackman submit to a blood test. It is also beyond dispute that the deputy complied with Wis. Stat. § 343.305(4) by reading Blackman the Informing the Accused form.

¶136 Even though statutory interpretation arising from a refusal is not present in this case, if it were, I would

15

conclude that Wis. Stat. § 343.305(9)(c) does not require that the issue of whether the deputy had probable cause to believe Blackman was impaired must be tried because Blackman was proceeded against pursuant to Wis. Stat. § 343.305(3)(ar)2. There is nothing in the record to show that if Blackman had refused, such refusal would be excused because of an inability to submit to blood tests. Accordingly, if he were to have refused, his driving privileges would have been revoked.

¶137 The legislature made a policy choice to test whether a vehicle's operator was under the influence of intoxicating substances when accidents cause death or great bodily harm. It did so because intoxication is not always readily apparent at the scene of a serious accident, but can nevertheless have contributed to loss of life and serious injuries. That policy choice is Wis. Stat. § 343.305(3)(ar)2.

¶138 Blackman's blood test showed a prohibited alcohol concentration of .104, well above the legal limit of .08 for an adult, and absolutely prohibited for a man who was underage to drink any alcohol on the date of the accident.

### D. Good Faith

¶139 Even if I were to assume that Blackman's consent was coerced and were to agree with the majority opinion's statutory interpretation, I nevertheless would conclude that the good faith exception to the exclusionary rule applies; and therefore, I would not suppress the results of the blood test.

¶140 At the outset, I note that the majority opinion incorrectly frames the exclusionary rule as a remedy courts

apply liberally. Without citation, the majority opinion states: "Ordinarily, evidence obtained through an unlawful search is excluded at trial."[5] This is contrary to well-established law when innocent police conduct is the foundation from which objection to a search arises.

¶141 The Supreme Court has concluded that "the [exclusionary] rule's 'costly toll' upon truth-seeking and law enforcement objectives presents a high obstacle for those urging application of the rule." Pennsylvania Bd. of Probation v. Scott, 524 U.S. 357, 364-65 (1998) (quoting United States v. Payner, 447 U.S. 727, 734 (1980)). The Supreme Court has repeatedly stated that "[s]uppression of evidence" should be the "last resort, not our first impulse." Hudson v. Michigan, 547 U.S. 586, 591 (2006); see also Utah v. Strieff, 136 S. Ct. 2056, 2061 (2016); Herring v. United States, 555 U.S. 135, 140 (2009). We have used similar admonitions when describing the exclusionary rule. Dearborn, 327 Wis. 2d 252, ¶35 (reasoning, "exclusion [of evidence] is the last resort").

¶142 "The rule's sole purpose . . . is to deter future Fourth Amendment violations." Davis v. United States, 564 U.S. 229, 236-37 (2011). "Where suppression fails to yield 'appreciable deterrence,' exclusion is 'clearly . . . unwarranted.'" Id. at 237 (quoting United States v. Janis, 428 U.S. 433, 454 (1976)). "Police practices trigger the harsh sanction of exclusion only when they are deliberate

---

[5] Majority op., ¶68.

17

enough to yield '[meaningfu[l]' deterrence, and culpable enough to be 'worth the price paid by the justice system.'" Davis, 564 U.S. at 240 (quoting Herring, 555 U.S. at 141).

¶143 Moreover, "marginal deterrence is not enough to justify exclusion; 'the benefits of deterrence must outweigh the costs.'" Dearborn, 327 Wis. 2d 252, ¶35 (quoting Herring, 555 U.S. at 129). "The principal cost of applying the rule is, of course, letting guilty and possibly dangerous defendants go free—something that 'offends basic concepts of the criminal justice system.'" Herring, 555 U.S. at 141 (quoting United States v. Leon, 468 U.S. 897, 908 (1984)). Given the high cost to society of excluding probative evidence against a defendant in a criminal trial, suppression of the evidence is "the last resort" and the burden is on the defendant to show that exclusion is warranted. Scott, 524 U.S. at 364-65.

¶144 Good faith is a well-defined exception to the exclusionary rule. See Dearborn, 327 Wis. 2d 252, ¶37. "The exclusionary rule does not serve its purpose when police act with a reasonable, good faith belief that their conduct is lawful." State v. Oberst, 2014 WI App 58, ¶9, 354 Wis. 2d 278, 847 N.W.2d 892; see also Leon, 468 U.S. at 919 ("We have frequently questioned whether the exclusionary rule can have any deterrent effect when the offending officers acted in the objectively reasonable belief that their conduct did not violate the Fourth Amendment."). The "good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well-trained officer would have known that the search was

illegal in light of all of the circumstances."  Herring, 555 U.S. at 145 (internal quotations omitted).

¶145 The good faith exception applies when an officer relies on a statute that is later found unconstitutional.[6] Illinois v. Krull, 480 U.S. 340, 349-50 (1987).  "Unless a statute is clearly unconstitutional, an officer cannot be expected to question the judgment of the legislature that passed the law.  If the statute is subsequently declared unconstitutional, excluding evidence obtained pursuant to it prior to such a judicial declaration will not deter future Fourth Amendment violations by an officer who has simply fulfilled his responsibility to enforce the statute as written." Id.

¶146 In the present case, there is no deterrent value in suppressing the results of Blackman's blood test.  Deputy Abler was required to read the Informing the Accused form to Blackman. Specifically, Wis. Stat. § 343.305(4) provides that "the law enforcement officer shall read the following to the person from whom the test specimen is requested."  Excluding the results of Blackman's blood test "will not deter future Fourth Amendment

---

[6] The good faith exception is not cabined to the factual circumstances in which it has previously been applied by the United States Supreme Court.  See People v. LeFlore, 32 N.E.3d 1043, 1050 (Ill. 2015) ("Clearly, application of the good-faith inquiry is not limited to the specific circumstances addressed by the Supreme Court in Davis [v. United States, 564 U.S. 229 (2011)] or any other Supreme Court case."); United States v. Stephens, 764 F.3d 327, 337 (4th Cir. 2014) (declining to limit "the good-faith inquiry only to the precise factual circumstances addressed by the Supreme Court").

violations" because the "officer . . . simply fulfilled his responsibility to enforce the statute as written." Krull, 480 U.S. at 349-50.

¶147 The deputy did not act with "deliberate, reckless, or grossly negligent conduct" and therefore, this case is not one in which suppression would yield "appreciable deterrence." Weighed against the high societal cost of exclusion, suppression of the blood test is not warranted in the present case. After all, suppression is the "last resort." The deputy did that which he was statutorily obligated to do; nothing more, nothing less.

¶148 The majority opinion concludes that suppression is necessary to deter officers from continuing to read individuals "in the same situation as Blackman" the Informing the Accused form.[7] However, this argument fails for an obvious reason: After the majority opinion in the present case concludes that it is impermissible for an officer to rely solely on reading the Informing the Accused form to obtain consent when a defendant is alleged to have violated Wis. Stat. § 343.305(3)(ar)2., an officer that does so will be unable to rely on the good faith doctrine. Cf. Leon, 468 U.S. at 924 ("Nor are we persuaded that application of a good-faith exception to searches conducted pursuant to warrants will preclude review of the constitutionality of the search or seizure, deny needed guidance from the courts, or freeze Fourth Amendment law in its present state.").

---

[7] Majority op., ¶73.

20

¶149 Additionally, the United States Supreme Court has "'never applied' the exclusionary rule to suppress evidence obtained as a result of nonculpable, innocent police conduct." Davis, 564 U.S. at 240. In this case, the purported "misconduct" was the incorrect information provided to Blackman. Ironically, the author of the majority opinion has previously permitted officers to misinform an individual of the consequences of refusal specific to that individual. See Washburn Cty v. Smith, 2008 WI 23, ¶80, 308 Wis. 2d 65, 746 N.W.2d 243. In Smith, an officer read an individual with a Louisiana driver's license the Informing the Accused form. Id., ¶53. The Court recognized that the penalties in the form did not apply to the individual. Id., ¶54. Yet, the Court held that the misinformation provided to the defendant was irrelevant so long as the officer correctly read the Informing the Accused form. Id., ¶81. Here, the officer also read the Informing the Accused form correctly even if the penalties in the implied consent laws were not accurate with respect to the defendant.

¶150 In sum, the deputy acted in good faith and his actions were confirmed by the court of appeals. Accordingly, I conclude that even if I were to assume that Blackman's consent was coerced and were to agree with the majority opinion's statutory interpretation, the good faith exception to the exclusionary rule would apply, and the results of the blood tests are admissible.

21

III. CONCLUSION

¶151 I conclude that: (1) Deputy Abler's reading the Informing the Accused form to Adam Blackman was not sufficient to overcome Blackman's free will such that the reaffirmation of his consent to evidentiary tests was coerced rather than voluntary; (2) the controlling statutes, correctly interpreted, comport with the deputy's reading the Informing the Accused form to Blackman; and (3) Deputy Abler, in good faith, read what he believed the statutes required. Accordingly, I would affirm the court of appeals, and I respectfully dissent from the majority opinion.